## PROGRESS CO. v. SALT LAKE CITY et al.

No. 2851.    Decided June 6, 1918.    Rehearing Denied July 5, 1918.
(173 Pac., 705.)

1. WATERS AND WATER COURSES—APPROPRIATION OF WATERS—SUR-
RENDER OF RIGHT. Where plaintiff had appropriated the waters of a
creek for power purposes, and subsequently defendants had used such
water for irrigation and domestic purposes, without protest, for 26
years, under an arbitration agreement, plaintiff's right to the use of
the water was surrendered and lost.   (Page 568.)

2. WATERS AND WATER COURSES—APPORTIONMENT OF WATER RIGHTS—
EVIDENCE. In a suit by a power company to enjoin a city and
others from appropriating water, evidence *held* not to show that an
apportionment of water to it during the nonirrigation season was
erroneous.   (Page 571.)

3. WATERS AND WATER COURSES—APPORTIONMENT OF WATER RIGHTS—
EVIDENCE—WASTE. In a suit by a power company to enjoin appro-
priation of water by a city and others, evidence *held* not to show
that the court erred in apportioning water during the nonirrigation
season for domestic purposes.   (Page 575.)

4. APPEAL AND ERROR—RIGHT TO ALLEGE ERROR—APPORTIONMENT OF
WATER RIGHTS. In a suit by a power company to enjoin appropria-
tion of water from a stream by a city and others, plaintiff could not
complain that an apportionment of water was erroneous as including
that which flowed from certain springs, where such water was seepage
from water already appropriated and to which plaintiff had no
right.   (Page 576.)

5. APPEAL AND ERROR—RESERVATION OF GROUNDS—WAIVER. Where no
objection is made below that all parties in interest are not made
parties to the action, objection is waived.   (Page 578.)

6. JUDGMENT—PERSONS NOT PARTY. A litigant may always suggest
to the court that it is powerless to adjudicate the rights of such
parties as are not before it, and the court may, on its own motion,
refuse to adjudicate their rights.   (Page 578.)

Appeal from the District Court of Salt Lake County, Third
District; *Hon. C. W. Morse*, Judge.

Suit by the Progress Company against Salt Lake City and
others to quiet title in water rights.

From the decree plaintiff appeals.

AFFIRMED.

*Van Cott, Allison & Riter* and *Joseph R. Haas* for appellant.

*F. S. Richards, Ogden Hiles, Barnard J. Stewart, Allen T. Sanford* and *C. E. Marks* for respondents.

FRICK, C. J.

This case was argued and submitted at a former term of this court. The court as then constituted, however, did not arrive at a decision in the case, and it went over for reargument to the court as now constituted. Mr. Justice THURMAN was, however, disqualified to sit in the case by reason of having been of counsel for some of the parties to the action, and for that reason Hon. P. C. EVANS, District Judge, was called in to sit with the other four members of the court. The case was again argued and submitted during the 1917 October term.

The plaintiff, a corporation, commenced this action in the district court of Salt Lake County in February, 1907, to quiet title to a certain quantity of the waters of Big Cottonwood creek. Big Cottonwood creek is a stream of considerable importance having its source in the Wasatch Mountains to the east of Salt Lake Valley, flowing in a westerly direction a distance of approximately twenty-five miles, and finally emptying into the Jordan river, which empties into the Great Salt Lake. The waters of Big Cottonwood creek except in times of floods, have for many years all been appropriated and used for power, irrigation, and domestic purposes by the inhabitants of Salt Lake Valley. The plaintiff made all those who claim some rights to the waters of Big Cottonwood creek parties to the action. A large number of corporations and individuals, approximately 400 in all, were thus made defendants to the action. There were 115 separate answers filed to the complaint, and in some instances a considerable number of defendants joined in the same answer. Many of the answers in addition to matters of defense, also contained

counterclaims in which the respective claimants set forth their rights in and to portions of the waters of Big Cottonwood creek and asked that their titles be quieted. Salt Lake City, however, is the principal defendant, and in its answer it sets forth various defenses. In one of these defenses it set forth facts in the nature of an estoppel and also pleaded title to a portion of the waters claimed by plaintiff, by adverse user, prior appropriation, and by purchase. In order to supply its inhabitants, numbering in excess of 100,000, with potable water, Salt Lake City acquired large interests in the waters of Big Cottonwood creek.

A trial upon the issues presented by the several pleadings commenced on the 30th day of September, 1907, and the taking of testimony continued during the fall and winter months of that year and until the spring of 1908. The case was submitted on the 18th day of April, 1908, and on the 6th day of June following the court rendered its decision upon all questions relating to the rights of the several claimants to divert and use the waters of Big Cottonwood creek during the irrigation season, that is, from April 1st to October 1st of each year; but in rendering that decision the court expressly reserved all questions relating to the right to divert and use the waters of said creek during the nonirrigation season, to wit, from October 1st of one year to April 1st of the following year, and requested the several claimants to produce further evidence upon the latter question. Additional evidence was produced upon that question, most of which, however, was limited to the use of the water from Big Cottonwood creek after the action was commenced. The case, however, was finally submitted upon that question, and on the 24th day of December, 1913, the court filed its findings of fact and conclusions of law and entered a final decree in the action. The court, on most of the features, found in favor of Salt Lake City, and while modifying, and in some instances disallowing, the claims of many of the counterclaimants, the court nevertheless, to a large extent, found in their favor, and the plaintiff alone appeals from the decree.

While all the parties to the action were also made parties to

this appeal, and while the plaintiff claims that the district court erred in its findings in favor of some of the water users, yet the main controversy is between the plaintiff, on the one hand, and Salt Lake City, upon the other. The principal controversy between those parties is due to the fact that Salt Lake City, in exchanging water which it takes from Utah Lake for water taken by the original appropriators from Big Cottonwood creek, plaintiff contends that its rights to the use of water from Big Cottonwood creek have been and are being interfered with. Agreements for the exchange of water were entered into between Salt Lake City and the following companies and individual owners of Big Cottonwood water, namely: Big Ditch Irrigation Company, hereinafter called Big Ditch, Big Cottonwood Lower Canal Company, hereinafter designated Lower Canal, and the owners of the waters which were diverted by what is known as the Hill Ditch, hereinafter styled Hill Ditch. The exchange contracts aforesaid were before this court in the case of *State* v. *Salt Lake City*, 29 Utah, 361, 81 Pac. 273, where the legality thereof was affirmed. The exchange of water between Salt Lake City and the ditch owners aforesaid was made for the purpose of giving the inhabitants of Salt Lake City potable water from Big Cottonwood creek for nonpotable but suitable, water for irrigation purposes which was taken by Salt Lake City from Utah Lake by means of a canal owned by it. That canal, its capacity and purposes are fully explained in the case of *Salt Lake City* v. *Irrigation Co.*, 40 Utah, 126, 121 Pac. 592, to which case reference is made for a more complete statement. That canal crosses Big Cottonwood creek some miles above the point where plaintiff diverts its water from said creek; plaintiff's point of delivery being the lowest one on the stream. Salt Lake City contracted to, and does, deliver to the several ditches aforesaid water from said canal for an equal amount of water which by said ditches was being diverted from Big Cottonwood creek and used for irrigation purposes. In other words, instead of taking the water from Big Cottonwood creek, the water users along said ditches take the water diverted to them from the Salt Lake City canal, which water

thence flows down said ditches and their laterals, and is diverted on to the lands of those who own the water. Upon the other hand, Salt Lake City takes the quantity of water that formerly flowed into those ditches from Big Cottonwood creek and distributes the same to its inhabitants. Salt Lake City, in order to use the water so exchanged, has, at a great cost, constructed a concrete conduit further up Big Cottonwood creek by means of which the water is conducted to Salt Lake City for distribution. The conduit was placed higher up the stream for the purpose of giving those who have homes in said city in elevated positions an opportunity to obtain water by means of gravity. While the contracts of exchange were all entered into and executed in June, 1905, yet, in view that Salt Lake City was required to construct said conduit, the exchange water was not actually turned into the conduit until early in the year 1907. Immediately after the water was turned into said conduit this action was commenced.

One of the principal questions presented for decision arises as follows: Plaintiff claims that its predecessors in interest appropriated a certain quantity of water from Big Cottonwood creek for power purposes at a date anterior to the date that an appropriation was actually made by one of the ditches with which the city affected an exchange and that therefore plaintiff's rights are prior and paramount, and that in diverting and using the water from said ditch Salt Lake City is interfering with plaintiff's rights. While, as we have seen, Salt Lake City contracted with the lower canal, yet the real controversy arises with what is called the upper canal, for the reason that the lower canal has succeeded to the rights of the upper canal to the extent at least that the water involved in this controversy is concerned. The allegations concerning plaintiff's appropriation are quite general. They are as follows:

"That heretofore, in about the year 1856, the said plaintiff, and its predecessors in interest, appropriated 150 second feet of water from said Big Cottonwood creek," etc.

The evidence upon the subject is equally general. Mr. Henry W. Brown, sixty-eight years of age at the time of the

trial, in testifying to the time when the first efforts were made by one Gordon to appropriate water from Big Cottonwood creek for power purposes, that is, for power to propel and operate a grist mill, said:

"The survey part of the Gordon race (millrace) had been done in the early winter of '55 and '56. Construction was commenced in the fall of '56. It was completed in the winter of '56 and '57. The Gardner mill (the mill in question) commenced grinding in the winter of '57 and '58."

The witness also testified that after the diverting dam was put in the millrace "took all the water that came down Big Cottonwood creek to that point, that low down." One of the principal questions in controversy is how much water in fact "came down Big Cottonwood creek to that point"—that is, to the intake or head of the millrace. Upon that question the testimony covers volumes. Indeed, the plaintiff, upon that and kindred subjects, produced eighty-two witnesses while the defendant city produced eighty-five. In addition to those there were many other witnesses. Each witness was cross-examined by at least three attorneys, and some were cross-examined by eight or ten. The oral evidence was supplemented by a great mass of documentary evidence, and the whole is thus so great in volume that we, except in particular instances, shall merely state our conclusions respecting the effect of the evidence. Counsel for Salt Lake City at the trial contended, and here contend, that the upper canal, to the rights of which the lower canal succeeded, was constructed and the water appropriated and diverted from Big Cottonwood creek before the appropriation was made by plaintiff's predecessors for power purposes as before stated. Much evidence both for and against that contention was also produced. With regard to plaintiff's rights the court found:

"That in the year A. D. 1856 the predecessors in interest and title of the plaintiff herein, the Progress Company, constructed a millrace, known as the Gordon race, for the purpose of taking water from the Big Cottonwood creek."

The court then proceeds to make findings regarding the use of the water, and the sources of plaintiff's water supply, and ends that part of the finding thus:

"And during the said irrigation season said plaintiff has hitherto taken and used and does now take and use into and through said Gordon race all of the water of said Big Cottonwood creek flowing in the stream at a point immediately below the upper intake of the Hill Ditch, also all the water flowing in Little Green river, and the same is used for power purposes at said power plant located at or near State street, and also for culinary and domestic purposes. And during the irrigation season plaintiff and its predecessors in title have hitherto used, and plaintiff is entitled to use, for power purposes, and to have its title thereto quieted to all of the waters of said Spring creek, not in these findings and said decree otherwise awarded to other parties, to be used at its power plant known as the Miller plant; the whole not exceeding 150 cubic feet of water per second of time."

Upon the other hand, the court found that the upper canal was constructed in 1856. The precise question of which one, the millrace or the canal, was prior in time, the court apparently did not determine. Nor is that question, for the reasons we shall hereinafter discuss, of controlling influence here. We cannot go into the facts and circumstances upon that question in detail. Should we do so, it would require us to go far beyond the limits of an ordinary opinion. We shall therefore limit the discussion to a few of the salient features. As before stated, Big Cottonwood creek is a very important stream to the inhabitants of Salt Lake Valley. Soon after the pioneers came to this valley, to wit, in 1847, they appropriated the waters of said stream and applied them to beneficial purposes. To that end they constructed a number of ditches by means of which they diverted the waters of said creek, and used the same to irrigate their lands, and also used it for other beneficial purposes. Up to and including the year 1856 there were thus constructed the following ditches and canals which diverted the water from the north side of Big Cottonwood creek, to wit: Big Ditch, 1848; Walker Ditch, 1849; Hill Ditch, 1851; Farr & Harper Ditch, 1852; Newman Ditch, 1854; and Upper Canal, 1856. There were also ditches taken out to the south as follows: Tanner Ditch (three

branches), 1848; Green Ditch (two branches), 1848. In addition to the foregoing ditches others were constructed as follows: Lower Canal, 1866; Brown & Sanford Ditch, 1869; Lower Ellison Ditch, 1872; Butler Ditch, 1872; Bagley & Knudsen Ditch, 1876; Knudsen Ditch, 1883; McGhie Ditch, 1884; Upper Ellison Ditch, 1884; Harper & Taylor Ditch, 1885; Severson Ditch, 1887; Bagley Ditch, 1894. It will hereinafter appear, however, that the water that was taken by all of the ditches that were constructed after 1876 amounted to but little, and in the low and what is termed normal flow of the creek none was taken by those ditches. The court found and decreed that the ditches hereinafter named were entitled to water as follows: When the water flowing in Big Cottonwood creek at or above the headgate of intake of the Hill Ditch, which is the lowest irrigating ditch down the creek and approximately a mile and a quarter above the headgate or intake of plaintiff's race, is reduced to a certain quantity, that is, to fifty second feet or less, the whole quantity, when reduced to sixtieths, should be divided among the several ditches between October 1st of one year and April 1st of the following year, which is termed the nonirrigation season, in the following proportions:

|  | Sixtieths |
|---|---|
| Butler Ditch | .67 |
| Brown & Sanford | 6.25 |
| Upper Canal | 9.63 |
| Thomas S. Newton | .04 |
| Tanner Ditch | 11.40 |
| Green Ditch | 7.30 |
| Walker Ditch | 1.20 |
| Farr & Harper | .43 |
| Knudsen & Bagley | .03 |
| Big Ditch | 15.75 |
| Hill Ditch | 1.96 |
| Lower Canal | 5.34 |

Further, that during the irrigation season, that is, between April 1st and October 1st of each year, when the water flow-

ing in Big Cottonwood creek at or above the headgate of the
Hill Ditch does not exceed 120 second feet, the whole there-
of shall be distributed, when reduced to sixtieths, among the
ditches as follows:

|                      | Sixtieths |
|----------------------|-----------|
| Butler               | .50       |
| Brown & Sanford      | 3.60      |
| Upper Canal          | 10.50     |
| Upper Ellison        | .70       |
| Newman               | .30       |
| Tanner               | 13.21     |
| Green                | 5.30      |
| Walker               | .32       |
| Farr & Harper        | .50       |
| Lower Canal          | 5.80      |
| Big Ditch            | 17.10     |
| Hill                 | 2.13      |
| Bagley & Knudsen     | .04       |

Counsel for plaintiff very earnestly contend that the court
erred in making the foregoing apportionments, and that in
doing so invaded plaintiff's rights. Prima facie there seems
to be merit to the contention. When we keep in mind, how-
ever, the defenses that were interposed by Salt Lake City, and
give force and effect to the preponderating evidence, what
seems to be a meritorious claim entirely disappears. Very
briefly stated, the findings and decree are based upon sub-
stantially the following facts and circumstances: Prior to
1879 much difficulty arose respecting the equitable distribu-
tion of water among the several ditches during the low-water
season and when the creek did not exceed what is known as
the normal flow. While it was conceded at the trial that
low water in the creek means a flow of fifty second feet, yet
the evidence is conclusive that in many years the flow of the
creek was reduced to considerably less than that amount.
Indeed, there is evidence in the record that the flow at times
was as low as fifteen second feet. The flow, however, varies
greatly in each year, and in some years is much greater than
in others, depending upon the amount of precipitation, the

time of the year it falls, the temperature of the season, and many other factors. The evidence is undisputed that the flow of the creek has risen to 777 second feet, and that in some years a comparatively large flow has continued far into what is known as the low-water season. Owing to these and other conditions, therefore, there was at times much strife among the ditches regarding their prior rights and the diversion of water. To obviate, or at least to minimize, that difficulty, what is called an arbitration meeting was held in the year 1879, in which a large majority of the water users of the several ditches then existing participated. That meeting established what is termed a schedule; that is, the flow of the stream when it has been reduced as stated in the findings to which we have referred was reduced to sixtieths, and apportioned among the several ditches in substantially the amounts found and decreed by the court. It may be said here parenthetically that the schedule, as established in 1879, was subsequently modified in minor details, but not so as to materially affect plaintiff's rights in any event. While, as before stated, not all of those interested joined in said meeting, yet the evidence is thoroughly convincing that subsequently they all acquiesced in the schedule adopted by said meeting according to which the waters of Big Cottonwood creek above the intake of the Hill Ditch was apportioned and distributed from the year 1880 until the decree was entered, and it is equally clear that all acquiesced in the minor modifications we have stated above. While there is some conflict in the evidence upon that subject, yet, when the conditions and the various changes in the flow of the creek are kept in mind, the conflict is not serious. While the plaintiff's predecessors were not parties to the arbitration agreement, yet, as just stated, the waters of Big Cottonwood creek flowing above the point before stated were for approximately twenty-six years apportioned and divided according to the schedule adopted in 1879, and the evidence leaves no room for doubt that during that whole period neither the plaintiff nor any of its predecessors in interest ever made any protest or objection to that method of distribution or to the quantities that were

apportioned to the several ditches. Indeed, the evidence is both strong and convincing that even before 1879, when the flow in Big Cottonwood creek had been reduced to a certain quantity, none was permitted to flow below the headgate of the Hill ditch. The preponderance of the evidence is to the effect that a tight dam was maintained not only at the head of the Hill Ditch, but also at the headgate of the Big Ditch, and no water was permitted to flow below the Big Ditch after the flow was reduced to a certain quantity, unless upon rare occasions, when in extraordinary dry seasons the underflow below the Big Ditch failed to supply the Hill Ditch with the amount of water to which it was entitled. We cannot pause to state the evidence upon that point. It must suffice to say that it came from those who were in a position to know the facts, and in many instances from those whose official duty it was to measure and apportion the waters among the several ditches. Witness after witness testified that for more than thirty years no water was permitted to flow past the Hill Ditch when the water had reached the low stage found by the court. Every water master and commissioner appointed under the statute who was called as a witness testified that neither the plaintiff nor any of its officers or agents, nor any of its predecessors in interest, had ever made a demand upon any one to permit the water to flow past the Hill Ditch, nor made any objection to the diversion and apportionment of the water as made. James Gordon, fifty-eight years of age at the time of the trial, a son of the Gordon who constructed the millrace, and under whom plaintiff claims, testified:

"While I was water master, or at any other time, I never heard any one demand that water should flow down past the Hill Ditch dam to the Gordon race, or any other user below until the Progress Company (the plaintiff) made their claims. I never heard my father make such a claim, nor James Gordon or Mr. Cahoon. * * * I can say they did not make such a claim to me while I was water master. * * * I first heard a year ago last fall that the Progress Company made a claim to have water go down past the Hill Ditch."

Practically the same statements, only in some instances

more elaborate and stronger, are made by twenty or twenty-
five other witnesses who were in a position to know the facts,
and many of whom were not interested in the litigation either
directly or indirectly.    But there are other circumstances
which in one sense are somewhat negative in character, but
which, nevertheless, are of much probative force.    For in-
stance, Mr. Brown, one of the plaintiff's most important wit-
nesses, merely testified that plaintiff's predecessor "took all.
the water that came down Big Cottonwood creek to that
point"—that is, down to the intake of plaintiff's race.    How
much that was is not disclosed.    It is quite probable that
some Big Cottonwood creek water reached the headgate of
plaintiff's race.    The evidence is undisputed that Big Cot-
tonwood creek, like most of our mountain streams, has a sub-
surface as well as a surface flow which varies at different
parts of the stream.    Upon that question the evidence shows
that at one point in the creek the flow of water was reduced
24.9 per cent. in a short distance, which point was above the
Big Ditch.    As before stated, the evidence is convincing that
a tight dam was for a long term of years also maintained at
the head of the Big Ditch, which is the first ditch up the
stream from the Hill Ditch, and that the latter ditch, except
in exceptionally dry years, was always fully supplied by the
underflow in the creek.    There was an underflow, therefore,
some of which at least came to the surface before the water.
reached the Hill Ditch.    From that fact alone a strong in-
ference arises that some more of the underflow came to the
surface between the Hill Ditch and the intake of plaintiff's
race; those two being considerably farther apart than the Hill
Ditch and the Big Ditch.    That fact, at least in part, also ac-
counts for the statements of some of plaintiff's witnesses that
during the low-water season of the year they saw water flow-
ing in Big Cottonwood creek below the Hill Ditch.    Plaintiff,
however, contends that the capacity of the millrace was 150
second feet, and for that reason it seems to contend that it
was entitled to 150 second feet.    The combined capacities,
however, of the ditches that were in fact first constructed,
and through which water was diverted from Big Cottonwood

creek for irrigation and domestic purposes, excluding the upper canal, the priority of which is questioned by plaintiff, was 158 second feet, and, if the upper canal is included, as in our judgment it should be, the combined capacities of the ditches having priority over plaintiff's millrace was 218 second feet. The capacities of the ditches which are conceded to have been prior in time, and also prior in right, thus far exceeded both the low-water and the normal flow of Big Cottonwood creek. But it is a well-known fact that merely to prove the capacity of a ditch does not establish prior rights to water in all stages of the stream. Under all the facts and circumstances, therefore, the plaintiff never obtained, nor now has, what is termed a primary right in the waters of Big Cottonwood creek.

If, however, plaintiff or its predecessors in interest at any time had such a right, it was surrendered and lost by the long-continued and uninterrupted acquiescence in the distribution of the water as agreed upon by the arbitration agreement of 1879, which was thereafter maintained, except in unimportant details, for more than twenty-six years before this action was commenced. As already stated, the only evidence of the quantity of water that was in fact appropriated by plaintiff's predecessors in interest is the capacity of its millrace. No measurements were made, so far as the evidence discloses, until in 1907, which was a very high-water year. Some of the witnesses testified that in the latter year the water was higher than it had been in any year since 1862. On July 8, 1907, during the high-water year, a measurement, however, was made for plaintiff by which the flow in the race was shown to be 138.6 second feet. A measurement was, however, also made in the preceding September by a hydraulic engineer for Salt Lake City, which measurement disclosed a flow of only 38.83 second feet, and that witness testified that that was nearly, if not quite, the capacity of plaintiff's race. We think, however, that the preponderance of the evidence shows that the race had a much larger capacity. The capacity of the mill-race is, however, not controlling, not even of great importance, in view of the

actual conditions disclosed by all of the evidence. No one seems to have known, at least no one testified respecting, the quantity of water that plaintiff's predecessors used to operate the gristmill. That mill was, however, not operated after 1881. After that year a certain smelter at Murray leased the use of the water flowing through the millrace and used it until 1899. How much was used is not disclosed. It was not until after that, along in 1905, that the plaintiff commenced the use of the water again by installing a plant for the purpose of generating electric power, and in addition thereto it used approximately 1.5 second feet to supply Murray City with water for domestic use. The quantity that the water wheel that was installed by the plaintiff required is in dispute. The evidence on behalf of the plaintiff was to the effect that it required eighty or ninety second feet, while hydraulic engineers who were witnesses for the city testified that the capacity of the wheel installed by the plaintiff did not exceed fifty second feet. In this connection plaintiff's counsel vigorously contend that the evidence is strong and persuasive that the plaintiff had appropriated and had always used a quantity of water in the low-water or nonirrigation seasons in excess of the quantity awarded to it by the district court, and that the findings and decree in that regard are erroneous. Counsel quote and rely on the following evidence: Samuel Brinton, a witness for plaintiff, testified that plaintiff's millrace "has always run full of water." C. P. Cahoon testified the race "was full of water winter and summer." James Gordon, in referring to the race, said, "It has been substantially full of water all of the time." John P. Cahoon testified:

"I think the Gordon race is about the same size now as it always has been. In the summer time the race has been filled up full as it can carry ever since I have known it. I think it is less in the winter time, probably three-fourths full."

Counsel conclude the evidence with the following statement:

"A great many witnesses testified as to the race being full of water all of the time," that is, winter and summer.

Plaintiff's witnesses also denied that a "tight" dam was maintained at the intake of the Big Ditch, as claimed by Salt

Lake City. The witnesses for plaintiff insisted that they saw water running in Big Cottonwood creek below the intake in that ditch at various times. It is a matter worthy of special remark, however, that none of those witnesses attempted to give the quantity of water that flowed in the creek below the intake of the Big Ditch at any time. Nor is it possible to tell from the evidence whether the water they saw was the subsurface flow of the stream or whether it was water that came to the surface below the Hill Ditch. Nor is there any testimony upon which the court could base a finding respecting the quantity of water that was used for the old mill by plaintiff's predecessors in interest. All that is left in doubt, and the only evidence upon which the court could have based such a finding is uncertain and inconclusive in respect to the quantity of water so used. It is quite clear, therefore, why the district court was unable to find the fact in accordance with the claims of plaintiff's witnesses. One of those reasons is that it was conceded at the last hearing in this court that the plaintiff makes no claim for additional water except during the low-water or nonirrigation season, that is, from October 1st of one year to April 1st of the succeeding year. It was also conceded at the argument—indeed, such is the agreement of all the parties to this action—that the entire flow of Big Cottonwood creek during that period is not in excess of fifty second feet, and, as before stated, the evidence is to the effect that the flow in certain seasons is less than that amount, at least during a portion of the season. That fact is therefore not only undisputed, but, in the face of the whole record, is undisputable. As indicated, the plaintiff claims that it has appropriated 150 second feet of water, and that that is substantially the capacity of its race or canal. It therefore insists that, in view of the testimony of the foregoing witnesses that the canal was running full at all seasons of the year, for that reason the court erred in not awarding it more water during the nonirrigation season. A moment's reflection will show, however, that the district court could not have made a finding in accordance with the statements of plaintiff's witnesses without having wholly disre-

garded the solemn admissions of all the parties to this action
that the entire flow of Big Cottonwood creek during the non-
irrigation season, which is the only time plaintiff complains of
a shortage of water, was at no time in excess of one-third of
the claimed capacity of its race and of the amount claimed
by it. If, therefore the entire flow of Big Cottonwood creek
during the nonirrigation season only amounted to fifty second
feet or less, how was it possible plaintiff's millrace, with a
capacity of 150 second feet could run full unless the water
was obtained from some other source?

As before stated, the evidence is clear and convincing that
no surface flow was permitted to pass below the Big Ditch
during the nonirrigation season. If, therefore, water flowed
in the creek below that point, it was a subsurface
flow, and not a surface flow. That such was the actual        2
fact is made quite apparent from a consideration of
all of the evidence, and the district court was fully justified
in arriving at such a conclusion. The contention, therefore,
that the district court erred in not awarding plaintiff more
water, and that under the evidence it should have awarded it
one-fourth of the flow of Big Cottonwood creek during the
nonirrigation season, is clearly not tenable.

It may be observed that the mere fact that plaintiff now
only claims one-fourth of the flow during the low-water season,
which would not exceed twelve and one-half second feet, or,
in case the flow in the stream was less than fifty feet, would
be less than that amount, alone shows that, if its millrace was
running full at all seasons of the year as claimed by the wit-
nesses, only a very small quantity of that water came from
the surface flow of Big Cottonwood creek. The district court
was therefore justified in finding that none of the water from
Big Cottonwood creek except the subsurface flow, all of which
plaintiff still receives, ever reached down to plaintiff's mill-
race. The question may, however, still be asked: Where did
plaintiff obtain its water to operate its plant? As the court
found, plaintiff constantly had at least two other sources of
supply, namely, Little Green river and Spring creek. In ad-
dition thereto it also had the underflow from Big Cottonwood

creek, as hereinbefore explained. Both Little Green river and Spring creek empty into Big Cottonwood creek above the headgate of plaintiff's millrace. It is quite probable, therefore, that plaintiff was in fact supplied from those three sources. That such was the fact may also be inferred from the fact that during all the years from 1879, and even prior thereto, until 1906, none of plaintiff's predecessors in interest made any complaint whatever. Again the evidence shows that at least two of plaintiff's original sources of supply largely increased their flow of water after the lands lying east and above plaintiff's race were being thoroughly irrigated. Upon that subject Mr. J. P. Cahoon, manager and treasurer of the plaintiff, testified:

"I think Spring creek has been increased in size at least ten times; * * * I think probably more than that since early years. I think Green river has increased maybe six or eight times the amount of water there was that flowed there in early years."

There is also much testimony by others to the same effect. True, the combined flow of Little Green river and Spring creek is less than plaintiff insists it is entitled to, but when the underflow from Big Cottonwood creek is considered in connection with the other two sources of supply, the court was justified in finding that the plaintiff obtained all the water to which it was entitled. It is also true that there is less water in Little Green river and Spring creek in the non-irrigation season than there is during the irrigation season. No doubt, like all other water users along one of our mountain streams, plaintiff's wants were not always supplied. This the manager conceded in his testimony. He said:

"We hardly ever have enough between October 1st and April 1st, that is, during the low-water season."

There, however, still is another circumstance which shows that the plaintiff at no time had or used a specific quantity of water from Big Cottonwood creek. On the 9th day of August, 1904, the city obtained an option to purchase the water from the individual owners thereof through whom plaintiff now claims. Plaintiff's manager, it seems, was not

only interested in the negotiations, but he was the principal actor for the water claimants. Both in the lease written by Mr. Cahoon, the manager, and in the option itself, mention of any particular quantity of water is apparently studiously avoided. All the sources of supply upon which plaintiff now relies were mentioned, but no specific quantity was named. The fact that no specific quantity was mentioned seems quite significant.

It is, however, further insisted that immediately after Salt Lake City turned the water it obtained from the several ditches as before explained into its conduit plaintiff's supply failed. In view of all the evidence, it seems the district court was not greatly impressed with that claim. Neither does it, in view of the whole record, impress us with compelling force. It is conceded by plaintiff's counsel that none of the water that is diverted to the north of Big Cottonwood creek ever finds its way back into that creek or can in any way augment or affect plaintiff's supply. It is likewise not disputed that Salt Lake City has turned as much water into the ditches as it took from the stream. Indeed, the water commissioner who is appointed under the statute to make the apportionments testified that he did not turn quite as much water into the conduit as Salt Lake City was entitled to under the exchange agreements. It is hard to conceive, therefore, how the mere fact of substituting canal water for Big Cottonwood creek water in those ditches, which in no way could affect the flow in Big Cottonwood creek after the diversion took place, can affect plaintiff's supply. If no exchange had been made, the same quantity of water, and, according to the statements of the water commissioner, a little more, would have been diverted from Big Cottonwood creek by the three ditches with which the exchange was made as was diverted into the Salt Lake City conduit by the commissioner. The only difference, therefore, was that, instead of permitting the quantity of water diverted by the three ditches to flow down the creek to the headgates of those ditches, it was diverted farther up the stream, but the quantity diverted was, if anything, less than would have been diverted by the ditches themselves.

If there was any loss, therefore, by seepage between the point of the intake of the conduit and the headgates of the ditches, that loss was borne by Salt Lake City, since it only diverted the quantity (or a little less) that would have reached the headgates of the three ditches. If, in addition to all the facts before referred to, it is kept in mind that the agents and attorneys of Salt Lake City have been thoroughly conversant with all the different ditches through which water had for many years been and was being diverted from Big Cottonwood creek, with the quantity diverted and the manner and basis upon which the waters of Big Cottonwood creek were apportioned and distributed among all the claimants, and that no claim was made by plaintiff, or any one in its behalf, and that, relying upon those facts, the authorities of said city before the bringing of this action had expended upwards of a half million dollars in paying the three ditches a bonus for the Big Cottonwood water and in constructing the conduit and for other purposes, then it becomes reasonably clear why the district court, acting as a court of equity, arrived at the conclusion that whatever rights plaintiff's predecessors in interest at one time may have had they, by their acquiescence and conduct covering a period of more than twenty-five years, had abandoned and lost, and that the plaintiff cannot now overthrow all that had been determined and acted upon by all those who had and continued to have an interest in the waters of Big Cottonwood creek. To permit the plaintiff now to insist upon its alleged prior right would not only be inequitable, but would work a great injustice, not only upon Salt Lake City, but upon all those who have acquiesced in and acted upon the apportionment and distribution of the waters of Big Cottonwood creek under the arbitration agreement of 1879. We remark that, if an owner of real estate, for a much shorter period, had acquiesced in and had permitted the open, notorious, and adverse use of his property by others, however valuable it might be, no court would hesitate to find against him, although the equities on the part of the claimants in that case would be much less than are the equities of the water users in this case.

Plaintiff's counsel, however, insist with much vigor that the court erred in allowing the quantity of water fixed by the decree to flow down the several ditches named in the decree during the nonirrigation season, and that the quantity awarded by the court to those ditches constitutes a waste. I confess that at first blush I was much impressed with counsel's contention. After a careful reading of the whole record, however, and upon a more careful reflection, I must also confess that my first impressions have been entirely dissipated. Plaintiff's counsel have gone to great pains in preparing tables showing the quantity of water that is allowed each family living on the several ditches. They have also shown that some families have cisterns, and therefore do not require water from the ditches. While from those tables it is apparent that the court made liberal allowances, yet if we keep in mind the length of the several ditches and the large number of laterals through which the water must flow, it is at once apparent that the conclusions which are deduced from those tables are not only inconclusive, but might become deceptive and misleading. The evidence is overwhelming that the water has flowed in those ditches and laterals for domestic and culinary use for more than twenty-five years; that the quantity awarded by the court to those ditches and laterals is necessary in order to supply those who live at the greatest distance from the main stream. True, plaintiff's counsel contend that a large number of those living along the stream have cisterns, and hence the amount they would use should be deducted from the amount that is permitted to flow into the several ditches. That fact is, however, not conclusive. Assuming that there are one hundred families living along a certain ditch, including its laterals, forty of whom have cisterns, the other sixty still require the flow of the entire water in order to have water reach the extreme ends of some of the laterals. It follows, therefore, that unless sufficient water is permitted to flow into the main ditches to supply all of the laterals and to supply all the users who may live on those laterals, those who live at the lower ends or at the greatest distance from the main stream might be de-

prived of the use of water during the very season when they need it for domestic purposes. When, therefore, all the facts and circumstances are considered, the district court awarded no more water to the water users living along those ditches and the laterals than the evidence shows was reasonably necessary for those people, and no more than they had been using for more than twenty-five years continuously from those same ditches and laterals. The district court therefore withheld nothing from the plaintiff that had not been withheld from it for more than twenty-five years before. In view of the whole record, we cannot say and ought not to say that the district court erred in the allowance of water for domestic purposes during the nonirrigation season.

Nor is the court's finding that the plaintiff is entitled to 150 second feet of water flowing in Big Cottonwood creek below a certain point in that stream at all inconsistent. Indeed, it is quite consistent. There are at times more than 150 second feet of water flowing in Big Cottonwood creek as far down as the plaintiff's race and beyond that point. Whenever that condition arises no one disputes the plaintiff's right to its full 150 second feet. Whenever that amount does not flow down the creek to plaintiff's race the plaintiff, nevertheless, is entitled to all that does flow down to that point, but no more, and unless the parties above that point take more than they are entitled to under the decree, plaintiff cannot legally complain.

It is, however, contended that the court erred in not including in its computations the water flowing from certain springs. These springs, so far as we can make out from the record, are ten in number. They are all on the north side of Big Cottonwood creek, some of which are a long dis-            4
tance therefrom, and thus cannot affect plaintiff's water supply unless the court should have added all the water flowing from them to the water apportioned to the ditches, and should have deducted the quantity flowing from the springs, whatever it may be, from the water that those ditches now take from Big Cottonwood creek. A few only of those springs are what are termed natural springs. From those, however,

no considerable amount of water flowed, and all of those were claimed by individual owners. The other so-called springs, it was shown, consisted of mere seepage water which came from the irrigated lands above. Plaintiff could acquire no interest whatever in that seepage water. If that water was ever diverted from Big Cottonwood creek, and doubtless at least some of it was, it was, nevertheless taken from the creek legitimately and was a part of the water that was legally appropriated by some water user under an upper ditch. We cannot see how the court could in any way interfere with the so-called seepage water. If it were conceded, however, that under certain circumstances the court could consider and regulate the water arising through seepage, etc., yet in this case, in view that no water is being wasted, the plaintiff, if it ever had any rights in the water at all, long ago abandoned and lost them for the reasons hereinbefore stated. Moreover, the water from those springs had been put to a beneficial use by those who claimed such water for many years. None of the water from those springs ever reached plaintiff's millrace, and therefore never augmented the flow and the source from which plaintiff derives its water. That is conceded by plaintiff's counsel, but they contend that the spring water, if added to the water that is diverted to the northward from Big Cottonwood creek, to that extent would increase the water that is diverted into the ditches, and that that amount should be deducted from the amount that is permitted to flow into those ditches. The question, however, is pertinent here: Why is not an appropriator of water who puts it to a beneficial use the owner of it regardless of whether it comes from a spring or from a stream? We cannot see how the district court could have awarded the plaintiff the quantity of water from Big Cottonwood creek which it claims comes from those springs without taking something from the owners of those springs and giving it to the plaintiff. To have done so the court would have exceeded its power. Then again it was made to appear that a number of the owners of those springs were not made parties to this action.

The court for that reason, therefore, could not adjudicate

their rights. Counsel for plaintiff, however, strenuously insist that that question cannot be considered by us, because it was not raised in the court below. Counsel evidently have in mind the familiar doctrine that, where no objection is made at the proper time and in the proper manner that all the parties in interest are not made parties to the action, none of the parties may object after judgment.

While that doctrine is elementary, especially under the Codes, yet it does not go to the extent counsel contend for. While it is true that a party may not be heard to complain that proper parties have been omitted and that he may not assail the judgment upon that ground, yet he may always suggest to the court that it is powerless to adjudicate the rights of such parties as are not brought into court. The court may always heed such suggestion, or on its own motion may refuse to adjudicate the rights of those who are not made parties, whenever it appears from the record that there are parties who have such rights. If, therefore, the district court refused to adjudicate the water flowing from the springs in question upon the ground that the alleged owners were not before the court, the refusal did not constitute error. Nor was it necessary in that regard for the district court to give any reasons or make any findings upon that subject.

There are one or two assignments relating to the admission of evidence. It is not necessary to discuss those, for the reason that, even though they were decided in plaintiff's favor, it would not affect the result.

We desire to add that the case is one where persons, and especially those having an interest, can readily find something in the findings or decree to criticize and suggest changes. When, however, the whole case is viewed in the light of all of the facts and circumstances, it would be very difficult to make or to suggest findings and to formulate a decree which would more nearly reflect justice to all concerned than is the case with respect to the findings and decree here. In our judgment the findings, conclusions, and decree of the

district court cannot be improved upon, and for that reason they are, as they should be, in all respects affirmed.

In conclusion we beg leave to express our appreciation of the thorough manner in which the evidence was abstracted and the briefs and arguments on both sides were presented. Counsel on both sides have greatly aided us in arriving at what, in our judgment, is a just result. While much can be said on both sides, yet, after a careful examination of the whole record, we are thoroughly convinced that the findings and decree of the district court are the result of a most careful and painstaking consideration of the whole case, and are in full accord with the preponderance of the evidence, and that the decree is as fair and just as under all the circumstances a decree could well be framed.

The judgment of the court below is therefore affirmed, at plaintiff's costs.

McCARTY, CORFMAN, and GIDEON, JJ., and EVANS, District Judge, concur. THURMAN, J., being disqualified, did not participate.