390 P.2d 586

**GREEN DITCH WATER COMPANY, a Utah corporation, Plaintiff and Appellant,**

v.

**SALT LAKE CITY, a municipal corporation, Defendant and Respondent.**

No. 9795.

Supreme Court of Utah.

March 23, 1964.

---

James E. Faust, Salt Lake City, for appellant.

Homer Holmgren, City Atty., Norman Kettner, Asst. City Atty., Salt Lake City, for respondent.

HENRIOD, Chief Justice, and CALLISTER, Justice:

Appeal from a judgment dismissing plaintiff's complaint. Affirmed, with no costs awarded.

Plaintiff was and is a mutual water company, incorporated in 1915 to distribute its decreed water under the so-called Morse Decree [1] to its shareholders. In 1916 the Secretary of State forfeited plaintiff's charter for nonpayment of franchise taxes. In 1920, most of the shareholders, as owners of the beneficial use [2] of the decreed Green Ditch Water Company's rights, themselves made an "Offer of Exchange of Water Rights" to defendant City. This ripened into a binding contract upon the latter's acceptance and execution of the terms thereof. This agreement and its interpretation, along

---

1. Progress Co. v. Salt Lake City, 53 Utah 556, 173 P. 705 (1918).

2. Genola Town v. Santaquin City, 96 Utah 88, 80 P.2d 930 (1938).

with the history of its execution are pertinent to this litigation.

An examination of the terms of this contract clearly points up an intention on the part of the signatories that in exchange for personal rights in Green Ditch water, Salt Lake City would furnish to the numerous shareholders in the Green Ditch Company, who made the offer, a definite amount of exchange water. It seems as clear that a personal, individual relationship with respect to its delivery and use was contemplated, intended and understood.

Beside the fact that these shareholders, according to the tenor of the exchange agreement, sought out the defendant by way of an affirmative written offer, which was accepted, the personal nature of its terms was highlighted by the following aspects thereof, with our observations added:

1. Throughout the document the shareholder beneficiaries of the offer were referred to in the plural, and it seems obvious that the interest of the parties was foreign to any concept looking toward concentration of rights thereunder in one person or corporate entity, even though in general terms its provision extended to the assigns of the parties.[3]

2. The shareholder signatories, having a right to do so,[4] unreservedly conveyed to defendant "all right, title and interest in and to the perpetual use of the waters * * to which *each* is respectively entitled, subject to the reservations, terms and conditions in this agreement set forth." It is the reservation that is the nub of this case and upon which plaintiff relies.

3. "*Each* of the *parties*" reserved ownership and right to use 500 gallons per day in the winter, and 900 in the summer, per acre, which by this court was held to mean per share.[5]

4. The gallonage, the offer recited, "shall be *distributed* and delivered by Salt Lake City, free of all charge and expense, *to the respective owners,* through water mains to be laid and maintained by Salt Lake City, as hereinafter more specifically set forth."

5. The water mains "hereinafter * * set forth," specifically were described, and the supplementation to the language of the next preceding paragraph recited that the defendant would "lay, maintain and operate *for the distribution of said water,* a suitable and efficient water main system * * * as will supply and deliver * * * to the *respective owners thereof,* and will keep the water pressure * * * to 30 pounds to the square inch" and that "*said pipeline shall be* laid upon the following streets: On Walker Lane from the Eastern end thereof west-

---

3. It is difficult to understand how Salt Lake City, a municipality, could have assigned its obligation to deliver the water it agreed to deliver, to a third party.

4. See Salt Lake City v. McFarland, 1 Utah 2d 257, 265 P.2d 626 (1954).

5. Salt Lake City v. McFarland, supra.

ward to the County Road on Highland Drive; on the Walker Holladay Road from Walker Lane northward to Big Cottonwood Creek Crossing; also on the main County Road or Highland Drive from Walker Lane northward to the crossing of Big Cottonwood Creek." All of which pointed up a personal relationship between defendant city and the shareholder signatories, for the beneficial use of the exchange water by the latter,—certainly not to one assignee of all of them which is not a beneficial user of the water, but only a distributor thereof.

6. The offer stated that "Salt Lake City shall * * * maintain, at its own expense, suitable *devices* for the measuring of said water at the *points* of delivery" and "in the event the *parties* hereto shall desire to change the place of *use of the water* and to have said water delivered to *them* at a point or points other than in the Green Ditch, Salt Lake City agrees to make such delivery of said water to the changed *points* of *use*."

7. Also: "Salt Lake City shall, at its own expense, install proper measuring *devices* either at the *property line* or at the *point of use*[6] for each *private connection* leading from the *mains* and shall measure to the *respective water users* under said *water main system* the quantity of water that *each respective owner* is entitled to."

8. "If any such water owner uses water in excess of the quantity of water to which he is entitled, he shall pay for the same at the regular Salt Lake City water rate charges at the time of *use*.

9. Under the contract, defendant City agreed to pay charges against the Green Ditch incident to control, maintenance and distribution of the waters of Big Cottonwood Creek, and otherwise protect the rights of the *parties* to the agreement.

10. Although the contract specifically provided for charging the signatories for any water used in excess of their gallonage entitlement, there is not one word therein that obligated Salt Lake City to credit the same signatories for any water not used in any month. Since there was a specific charge for any excess used by the signers, and since the contract did not provide a credit for unused water incident to any given month, it seems inescapable to conclude other than that the parties intended that the outright, unconditional grant to the city of all the signers' right, title and interest should vest in the city absolute ownership and title to the unused water.[7] That seems to have been the conclusion in the McFar-

6. There is nothing in this record indicating that plaintiff had any property line to which any water could be delivered for plaintiff company's personal beneficial use.
7. In the sense that using such language connotes only a right to use water to the exclusion of others except the state, this court having said that such use is permissive and subordinate to the title in the state of all waters within its boundaries.

land case, either express or by necessary implication, when it was said that "When the creek water to which appellants' *stock ownership* entitled them was turned into the City's mains, title to such water vested in the City" and that "The City was thereafter free to sell its water to whomever it pleased, including the stockholders from whom they had purchased it."

11. The contract further provided that if the City accepted the offer of the water users, it *immediately* would construct the mains specified (in the streets specifically delineated in the offer, as mentioned above) and deliver to the signatories the water continuously "to which the respective *owners, parties* hereto are entitled."

12. The contract further provided that the "City would make connections to the mains up to the *property lines, on either side of the street,* for the *present residents."* It even specified the size of pipe when it said the city would furnish the residents on either side of the street, one inch galvanized pipe to make the connection from the mains to their properties. (Emphasis ours.)

Plaintiff's complaint consists of three causes of action: 1) that since 1918 [8] plaintiff has been the owner of the water, subject of this suit, and that defendant has taken it without plaintiff's objection, but for which it should pay plaintiff; 2) that

the exchange agreements made in 1920 were void because of mutual mistake; and 3) if it were not void, plaintiff was the owner of any of the water which its shareholders did not use under the terms of the exchange agreements by virtue of assignments by them to plaintiff of their interests in the exchange agreements.

■ Under the pleadings and affidavits, and the specific provisions of the exchange agreement, we believe and hold that the agreement was not only valid, but that title to any unused water to which the signatories otherwise would have been entitled, by virtue of their shareholders' interests, vested in the City. Holding as we do, the first and second causes of action need not be canvassed.

The only issues left, therefore, are whether, by virtue of the shareholders having assigned their interests in the exchange agreement, the plaintiff has any right to unused water reserved to the individual signatories of the agreement, and whether such signatories by assigning such interests to plaintiff, in all probability could accomplish indirectly what they could not have done directly.

It must be conceded that the record reflects no transfer of their stock certificates to plaintiff, and presumably they are still being serviced by Salt Lake City under the

8. By virtue of rights awarded in the Morse Decree, supra, affirmed in Progress Co. v. Salt Lake City, 53 Utah 556, 173 P. 705 (1918).

agreement. The tenor of this litigation has to do only with transfer of rights to water not used. The McFarland case indicates that these assignors had no right to any credit for unused water, and it is difficult to see how a simple assignment of such rights that this court has said gave no rise to a credit for such unused water, could create such a credit where it did not exist before, in light of the true intent and purpose of the 40-year-old compact, reflected by compliance therewith by all signatories up to the McFarland decision and four years thereafter when this litigation arose.

It seems rather obvious that these assignments were designed to obtain water that could not be obtained under the McFarland decision, and it seems equally obvious that should such be the case, the City would have to deliver in one pipe to one entity all unused water claimed by a multitude of shareholders, with one measuring device. The net result, since the plaintiff could allocate to these same shareholders, or other shareholders, all of the unused waters of each, at times when the McFarland case said this couldn't be done, would be to prevent Salt Lake City from billing water users, since by proper allocation by the plaintiff company, any excess use, or at least a greatly reduced excess use by the individual users, would eliminate the income of the city arising from any excess water delivery for which the individual signatories agreed to pay. Had Salt Lake City contemplated the

probability of any such maneuver, (or the offerors, for that matter) it is hardly likely that the City would have accepted the offer with the chance that it would lose the income which, it cannot be gainsaid, surely was a vital and substantial part of the consideration that resulted in the acceptance of the offer for the exchange agreement.

There is no apparent reason why, after 17 years' acquiescence by plaintiff in a practice and understanding between the City and the offerors in which plaintiff cooperated in furnishing information to the City with respect to its shareholders, and where, over a period of 38 years, all signatories complied with the terms of the exchange agreement, unless it was for the purpose of trying to comply with the interdictions of the McFarland decision's language, but by a device that seems obvious, attempt to overreach and avoid its real conclusion and implications. If for no other reason, it seems that the plaintiff is a little late in asserting its alleged rights and in using technical language in a contract not consistent with the real and obvious intent and purpose thereof when read as a whole, as interpreted by the McFarland case, and as now construed by this court.

No notice of plaintiff's claim was given to the City, and within a month before this suit was filed, plaintiff was certifying to the City the names of shareholders who were entitled to the fruits of the exchange agree-

ment. The record reflects no restrictive endorsement on any transfer of stock certificates. Without any contract between transferor and transferee of a stock certificate, and without knowledge of the latter or the City, it seems novel that plaintiff could claim rights to unused water which this court said did not inure to the benefit of the assignor personally.

■ Plaintiff makes but one point on appeal: That Salt Lake City v. McFarland, supra, is not controlling here. This sole point is urged because the trial court in a memorandum decision dated November 8, 1962, granted a motion for summary judgment based on the Supreme Court decision in the McFarland case. The *decree,* which was entered on November 15, 1962, a week later, was signed, dismissing the complaint. No reason was assigned therefor. We have said that even if the trial court assigns a reason for its judgment that may not be well taken, if otherwise there is a solid basis for the judgment, it will be sustained.[9] Since plaintiff relies solely on the McFarland case as being unauthoritative here, there would be justification for our affirmance of the trial court anyway in view of our observations and conclusions. This is not to say we think the McFarland case uncontrolling. We think a fair reading of the entire decision would impel one to conclude that *it is* controlling here.

In the McFarland case we held under the same contract referred to here, that Salt Lake City obtained title absolute to the shareholder's water rights and could dispose of the water as it pleased. It is highly significant that we concluded that the shareholder, under the agreement, having failed to use all the water to which he was entitled, still was required to pay for any excess he used in a given month. Since he had claimed credit for unused water at other times, but was required to pay for any excess used in such given month, it seems inescapable to conclude other than that this court, in refusing to construe the contract so as to credit him with unused water at another time, made it obvious that the title to such unused water remained in Salt Lake City, with the correlative implication, if not conclusion, that the contract between the shareholder assignor of his water rights, could not result in the latter's assigning such unused water to another,—particularly water to be determined conjecturally in the future. This despite the urging by plaintiff that the court in the McFarland case, in obiter, said the question of sale of the water by the shareholder on terms other than those contained in the exchange agreement was not before us in that action. It is now before us and we conclude that any proposed sale of any unused water to a third person would be encumbered with the requirement that any failure beneficially to

9. Tree v. White, 110 Utah 233, 171 P.2d 398 (1946).

use any portion of the water to which he was entitled would burden his assignee with the same condition. Under the terms of the contract, clearly evincing an intent to deliver water to dozens of beneficial users, it hardly can be said that plaintiff, strictly a distributor of water, was intended, as an assignee, to be a resident on one side of a street, one of a group designated throughout the contract in the plural, to which latter group of numerous signatories the water was to be distributed in mains specifically to be laid out in a number of streets, deliverable in one-inch pipes, measured by devices to be installed by the City for the residents using the water by individual entitlement, highlighted by numerosity of users,—not just one, deliverable to *points* designated, at the property line of the signers, with connections leading from the specified mains thereto, after the installation of the mains in the specified streets became a fait accompli.

We think and conclude that in most respects the McFarland case is controlling here and that, irrespective of it, the plaintiff otherwise cannot claim the transmutation of a nonexistent right in his assignor to an existing right in the assignee, where the interest of the whole exchange agreement clearly reflects otherwise, looking to a personal relationship, beneficial use by practically all of the shareholders of Green Ditch, where rights and obligations seem clearly to be not assignable to accomplish a result and purpose not contemplated by the very essence of a specific agreement.

WADE, J., concurs.

CROCKETT, Justice (dissenting in part):

I agree that the plaintiff has shown no basis for voiding the exchange agreement. But I think the court's opinion fails to allow the plaintiff and the shareholders the rights that contract gives them. It seems to me that a fundamental difficulty is encountered enroute to its conclusion. The only right Salt Lake City has to the waters of the Green Ditch derives from the contract referred to. The City and the plaintiff's shareholders are bound by their contract and their rights are permanently fixed by it; neither lapse of time nor manner of use have changed them. The City does not and could not contend otherwise. We therefore look to the contract.

I submit that it is so plain as to be unmistakable that the contract does not convey the water in dispute to Salt Lake City, but provides to the contrary in clear and certain terms. In connection with the conveyance of the waters of the Green Ditch to Salt Lake City it states that:

"Each of the parties [the shareholders] hereto *reserves an ownership in and the right to the constant and perpetual use.*

' * * * of water, in said Green Ditch * * * [describes quantity of water amounting to 500 gallons per day from October 1st to April 1st and 900 gallons per day from April 1st to October 1st for each share of water].";

and the agreement further states that the quantity of water, "as above set forth and *title retained thereto,* is as follows, to-wit: [listing shareholders and amount owned] * * *."

It is significant to note that the contract does not state that the parties reserve the right to use *up to 500 gallons,* or *up to 900 gallons,* per day, and that the amount unused belonged to the City. However, that is the practical effect of the court's decision. Had that been the intent, it could easily have been so stated. But the contract unequivocally reserves to the shareholders the *ownership and the right to use that total and definite quantity of water.* The ownership of water includes the right to use, and also to sell, lease, transfer or assign it. Baird v. Upper Canal Irrigation Company, 70 Utah 57, 257 P. 1060. The contract itself recognizes this and refers to the owners, "their successors or assigns." The plaintiff Green Ditch alleges that it is the assignee of all of the shareholders. On summary judgment against it this should be taken as true. Thus, plaintiff Green Ditch Company has the right to use the full quantity of water specified for each share, multiplied by the number of rights of which it proves it is assignee. I fail to see in the summary record before us any basis for even a conjecture that plaintiff is claiming only the "unused water."

If a person holding one share has a right to use the quantity of water due for one share, and he obtains by purchase or assignment another share, he becomes entitled to receive another such quantity of water; and if he obtains five shares, he is entitled to five such quantities, or 10, or 20, or any number of such quantities due the number of shares he acquires. I cannot see why this is not also true of the plaintiff company, nor why it should not be entitled to the total of the water represented by any number of rights under the contract of which it is assignee. This is not altered by the fact that the contract also provides that if any water owner uses in *excess* of the quantity of water to which he is entitled, he shall pay for the same at the regular Salt Lake City water rates. It must be conceded that under such provision if the plaintiff, or any other user, should use water in excess of that due under the rights it holds, it would have to pay as stated.

The question which must be confronted and answered is by what means the City can become owner of water not conveyed to it by the contract. It is urged that this result is brought about by the holding in

Salt Lake City v. McFarland, 1 Utah 2d 257, 265 P.2d 626. To this proposition there are two answers: (a) McFarland does not compel any such anomalous result, and (b) even if it did, it would be to that extent wrong and unjust. I do not interpret that case as dealing with the issues involved here. There, McFarland as an individual shareholder and user of city water under the agreement was seeking to avoid being billed by the city on a monthly basis and claimed the right to average his monthly consumption of water on a semi-annual or annual basis. Among the unique characteristics of water as property is that it is more valuable during some months of the year than others. The inequity and unfairness of permitting McFarland to take less water when it was less in demand and therefore less valuable and to take more water when it was more in demand and thus more valuable was recognized and he was not permitted to average out his monthly usage.

But the decision of the McFarland case just referred to should not be confused or distorted into a ruling that the holder of a share, or any number of rights to receive water (such as plaintiff) cannot demand and receive in any month the full quantity of water due under the contract for each right it holds. The contract requires the City to deliver that amount of water, and if that is all it is required to do, it has no just cause for complaint. When the water is so delivered, the shareholder, which includes any assignee or transferee of a share or shares, should be able to use or dispose of the water in any lawful manner, or to drink it out of the spout if he so desires. In regard to the plaintiff's claim to the aggregate of all of the water of the Green Ditch shareholders as their assignees, we do not have to concern ourselves with what arrangement it has or may make with them, except to say that neither the plaintiff nor its shareholders can impose any greater obligation or burden on the City than it undertook by the terms of the contract: i. e., to deliver for each share the quantity of water originally contemplated by the parties and stated in the agreement when it was executed: for each share 500 gallons per day during the winter and 900 gallons per day during the summer.

I do not agree with the statement as to limitation of the issues raised on appeal. In view of the decision of the majority of the court it would serve no useful purpose to discuss plaintiff's other contentions. (Emphasis ours.)

McDONOUGH, J., concurs in the views expressed in the opinion of Mr. Justice CROCKETT.