2000 UT 3

**SALT LAKE CITY, a municipal corporation, Plaintiff and Appellee,**

v.

**SILVER FORK PIPELINE CORPORA-TION, a Utah corporation, Defendant and Appellant.**

No. 980203.

Supreme Court of Utah.

Jan. 7, 2000.

Rehearing Denied Feb. 25, 2000.

Roger F. Cutler, Ray L. Montgomery, Christopher E. Bramhall, Joseph Novak, Max D. Wheeler, Rodney R. Parker, Salt Lake City, for plaintiff.

Benjamin T. Wilson, James L. Warlaumont, Jeffrey W. Appel, Salt Lake City, for defendant.

STEWART, Justice:

¶ 1 Silver Fork Pipeline Corporation (hereinafter "SFPC") appeals the trial court's decision to quiet title in Salt Lake City to nearly .5 cubic feet per second ("c.f.s.") of water flowing in Big Cottonwood Creek (the "creek") that SFPC had been diverting at the Kentucky–Utah Mine (the "mine"). SFPC also appeals the court's dismissal of its counterclaim seeking reimbursement of amounts it paid Salt Lake to purchase water from the mine. We affirm.

## I. THE MORSE DECREE ADJUDICATION OF BIG COTTONWOOD CREEK

¶ 2 Big Cottonwood Canyon lies southeast of Salt Lake City. Big Cottonwood Creek flows in a westerly direction down the center of the canyon. Much of the water from rain and snow falling in the Big Cottonwood Drainage Area flows down the mountain slopes, above and below ground, until it discharges into the creek. By 1894, Salt Lake and its predecessors in interest had fully appropriated the water flowing in the creek near the mouth of the canyon by diversion and beneficial use. Nevertheless, in 1907, longstanding disputes over water rights in the creek came to a head. District Judge C.W. Morse resolved these disputes in *The*

*Progress Co. v. Salt Lake City*, Civil No. 8921 (the "Morse Decree"), *aff'd*, 53 Utah 556, 173 P. 705 (1918), an adjudication lasting between 1907 and 1914, in which he allocated rights to most of the waters in the Big Cottonwood Drainage Area. *Progress* was not a general adjudication, and neither SFPC nor any of its predecessors in interest participated therein.

¶ 3 The Morse Decree awarded rights of use to all water flowing in Big Cottonwood Creek[1] in sixtieths under three categories depending on the time of year and volume of water.[2] For our purposes, we need note only that between 1920 and 1984, Salt Lake acquired most of the shares of the creek through purchase and exchange agreements. At the time of this trial, Salt Lake's water rights to the creek ranged between 90.42% and 99.23%.[3]

## II. EARLY HISTORY OF THE SILVER FORK AREA AND THE KENTUCKY–UTAH MINE

¶ 4 Silver Fork is a community in Big Cottonwood Canyon that lies south of Big Cottonwood Creek. Historically, individuals employed in grazing, timber, and mining resided in the Silver Fork area. The actual population of Silver Fork and other communities in the canyon during any specific period is unclear.

¶ 5 There are many mines in Big Cottonwood Canyon, two of which are relevant to this case: the Woodlawn Mine and the Kentucky–Utah Mine. Excavation of the Woodlawn Mine started around 1900. In 1915, miners began excavating the Kentucky–Utah Mine and continued to dig intermittently until 1943. The Kentucky–Utah Mine lies entirely within the Big Cottonwood Drainage Area. Owners excavated the Kentucky–Utah Mine to extract minerals and drain water encountered in other nearby mines, including the Woodlawn Mine.

¶ 6 The Kentucky–Utah Mine intercepts underground percolating water through seepages and cracks in its tunnel walls. This water is collected approximately 1,000 feet inside the tunnel and diverted to its portal. The portal of the mine is located approximately one-quarter to one-half mile south of, and approximately 500 vertical feet above, Big Cottonwood Creek. The portal is also within several hundred feet of the Silver Fork area and approximately 12 miles from the mouth of the canyon.

¶ 7 Evidence at trial indicated the mine did not collect a substantial amount of underground water until well into its excavation, likely after 1930. It is not evident when, during its nearly thirty-year excavation, the mine produced the nearly .5 c.f.s. of water claimed by both Salt Lake and SFPC. Nor does the record disclose how much water collected in the mine, if any, originates from other mines such as the Woodlawn.

## III. ORIGIN OF THE SILVER FORK PIPELINE CORPORATION AND ITS USE OF WATER FROM THE KENTUCKY–UTAH MINE

¶ 8 As grazing, timber, and mining in the canyon waned, Silver Fork eventually became a community for summer and year-round residents unrelated to any of these industries. As early as 1935, these residents

---

1. The Morse Decree provided Salt Lake with water rights in the Big Cottonwood Drainage Area in addition to those listed herein; however, these rights have no application in this case.

2. Under category 1, the Morse Decree awarded water rights during the irrigation season, April 1 through October 1, when the flow of the creek at a particular intake is between 0 and 120 c.f.s. Under category 2, the Morse Decree awarded rights during the irrigation season when the flow of the creek is between 120 and 351.5 c.f.s. Under category 3, the Morse Decree awarded water rights during the non-irrigation season, October 1 through April 1, according to whether the flow of the creek is below or above 50 c.f.s.

The Morse Decree awarded Salt Lake the following shares in the creek: under category 1, about 25 shares, or 41% of all water flowing in the creek; under category 2, about 23 shares, or 38% of the creek; and under category 3, about 16½ shares, or 27%, plus an additional 48.8 c.f.s. when the creek exceeds 50 c.f.s.

3. Salt Lake's rights under category 1 totaled 59 ½ shares, or 98.72%. Its rights under category 2 totaled 54¼ shares, or 90.42%. Its rights under category 3 totaled just under 60 shares, or 99.23%, plus 48.8 c.f.s. when the flow exceeds 50 c.f.s.

permissively used water on demand emanating from the mine. In June 1935, Jesse Hulse and Ernest Nielson obtained title to approximately eighty acres of land in the Silver Fork area, northwest of the portal of the Kentucky–Utah Mine. They subsequently developed and sold this property to other persons for building summer homes and cabins.

¶ 9 Initially, Hulse and Nielson obtained water for their cabins by dipping it from a nearby creek, likely either Big Cottonwood Creek or Silver Fork Creek. In 1940, Hulse obtained authorization from the U.S. Forest Service to construct a ditch across approximately 400 feet of Forest Service land from the portal of the Kentucky–Utah Mine to his cabin. Hulse then obtained permission from owners of the mine to use their water and began digging the ditch. Beginning in 1941, all water emanating from the mine, except during winter months, was diverted through the ditch to Silver Fork.

¶ 10 In August 1945, Hulse and Neilson entered a contract with Salt Lake entitled "Application for Water" in which Hulse and Nielson agreed to construct and maintain the ditches through which they diverted water from the mine. Salt Lake agreed to sell water flowing in the ditch in exchange for $2 per cabin each year. Hulse and Neilson also agreed to replace the ditch with a pipeline and to return water not used for domestic and culinary purposes to the creek.

¶ 11 In 1950, Hulse formed the Silver Fork Pipeline Corporation, a non-profit corporation organized to construct, operate, and maintain the diversion works extending from within the mine to the subdivision on the former Hulse–Nielson property. Shares in the corporation are owned by individuals who own property in the Silver Fork area.[4] In that same year, SFPC contracted to pay Salt Lake $5 every year for each cabin located in the Silver Fork area which used water from the mine. By its terms, this agreement superseded the contract between Salt Lake and Hulse and Nielson.

¶ 12 In 1963, Salt Lake and SFPC amended this agreement in order to increase the water usage rate to $15 per year for each cabin. In 1965, Jesse Hulse relinquished all right, title, and claim in his improvements to the watercourse he constructed across Forest Service land to SFPC and canceled the permit issued to him in 1940. The Forest Service subsequently issued SFPC a permit authorizing the maintenance and use of the same watercourse between the mine and the Silver Fork area.

## IV. EVENTS PRECIPITATING THE PRESENT DISPUTE

¶ 13 In the spring of 1991, the state engineer sent a letter to SFPC indicating that if it could not provide evidence of a right to the water it diverted from the mine, legal action would ensue to prevent Silver Fork residents from diverting the water. On April 1, 1991, SFPC filed an underground water claim, or "diligence claim," and a change application claiming that it owned title to the right to use approximately .5 c.f.s. of water intercepted in the mine.

¶ 14 On December 10, 1991, and June 22, 1992, Salt Lake filed with the engineer an "Application for Temporary Change of Water," and an "Application for Permanent Change of Water," respectively. These applications requested permission to change its point of diversion from one of its ditches near the mouth of the canyon to the portal of the mine. The engineer stayed any action on both SFPC's claim and Salt Lake's applications pending resolution of this dispute.

¶ 15 Since 1991, SFPC has continued to pay Salt Lake for the water it diverted from the mine pursuant to its agreement. Since that time, however, SFPC has paid Salt Lake "under protest," claiming that it is the rightful owner of waters emanating from the mine.

## V. PROCEEDINGS BEFORE THE TRIAL COURT

¶ 16 Salt Lake filed suit against SFPC in district court seeking to quiet title in itself to all water intercepted in the mine. Salt Lake

---

4. At the time of trial, shares of Silver Fork Pipeline Corporation belonged to approximately 260 owners of cabin lots in the Silver Fork area, on which its residents had constructed 196 cabins.

claimed title to this water as part of its appropriation of virtually all rights to water flowing in Big Cottonwood Creek adjudicated in the Morse Decree. SFPC claimed title to use waters intercepted in the mine by virtue of its 1991 diligence claim and by adverse possession. SFPC also filed a countersuit seeking reimbursement of all money it had paid under its purchase agreements with Salt Lake for use of water from the mine.

¶ 17 After a bench trial, the court quieted title in Salt Lake to all water intercepted in the mine based on several findings: (1) Salt Lake holds rights to use nearly all water flowing in the creek at the mouth of Big Cottonwood Canyon, (2) water intercepted in the mine was naturally tributary to the creek above Salt Lake's points of diversion, and (3) interception of this water by SFPC substantially interferes with Salt Lake's water rights at the mouth of the canyon. With respect to the other claims, the court concluded that the evidence did not support SFPC's diligence claim, and that SFPC failed to prove the elements of adverse possession. Having quieted title in Salt Lake, the court then dismissed with prejudice SFPC's claim for reimbursement of money it paid to purchase the water.

 ¶ 18 A quiet title action requires the application of a rule of law to decide ownership of the property in question. *See Oates v. Chavez*, 749 P.2d 658, 659 (Utah 1988). The validity of adverse possession, *see Olwell v. Clark*, 658 P.2d 585, 586 (Utah 1982), and diligence claims also requires the application of rules of law. We review the trial court's conclusions of law for correctness. *See Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 931 (Utah 1993). We review the trial court's findings of fact under a clearly erroneous standard, resolving any ambiguity in the evidence in favor of the trial court's judgment. *See Oates*, 749 P.2d at 659.

¶ 19 SFPC's various arguments on appeal fall into two main categories. First, SFPC challenges the validity of Salt Lake's alleged title to the water intercepted at the mine. Second, it attempts to establish its own title to the intercepted water.

 ¶ 20 In Utah, title to water rights is adjudicated in the same fashion as title to real property. *See Church v. Meadow Springs Ranch Corp.*, 659 P.2d 1045, 1048 (Utah 1983). To succeed in an action to quiet title to water rights, "a plaintiff must prevail on the strength of his own claim to title and not on the weakness of a defendant's title or even its total lack of title." *Id.* at 1048–49 (citations omitted). Under our current Water Code, certificates of appropriation issued by the state engineer, applications filed with the state engineer, court decrees, or other notices of claims filed pursuant to law are evidence of title to water rights. *See* Utah Code Ann. § 73–5–13 (Supp.1999).

## VI. SALT LAKE'S TITLE TO WATER INTERCEPTED IN THE KEN-TUCKY–UTAH MINE

¶ 21 SFPC argues that Salt Lake failed to prove, by way of decreed right, certificate of appropriation, or diligence or use claim, its alleged right to divert water at the mine. SFPC concedes the Morse Decree provided Salt Lake title to use of water flowing in the creek near the mouth of the canyon. However, according to SFPC, because the Morse Decree issued in 1914, and percolating water was not subject to appropriation in Utah prior to 1935, the Morse Decree could not provide Salt Lake with rights to the underground source waters of the creek. Accordingly, Salt Lake's water rights are limited to specific points of diversion at the mouth of the canyon, as set forth in the Morse Decree. SFPC further argues that Salt Lake's failure to file a change application with the state engineer seeking permission to change its point of diversion from the mouth of the canyon to the portal of the mine precludes Salt Lake from relying on the Decree to claim title to water intercepted in the mine. Salt Lake counters that the Morse Decree grants it title to water intercepted in the mine, because this water is naturally tributary to the creek. In addition, even prior to 1935, Utah law allowed owners of surface water rights to enforce their rights against

anyone who interfered with the source of those waters, including percolating water.[5]

▉ ¶ 22 Salt Lake correctly asserts that a right to water includes an interest in the source(s) of those waters.[6] *See Little Cottonwood Water Co. v. Sandy City*, 123 Utah 242, 249–50, 258 P.2d 440, 443 (1953). Thus, Salt Lake possesses an interest in the source waters to Big Cottonwood Creek. The question is whether the mine waters are, in fact, a source of the creek.

*A. Water Intercepted in the Mine Is Naturally Tributary to Big Cottonwood Creek*

▉ ¶ 23 To be considered source waters, the percolating waters in question must be naturally tributary to the creek above Salt

Lake's historic point of diversion. *See, e.g., Mountain Lake Mining Co. v. Midway Irr. Co.*, 47 Utah 346, 149 P. 929 (1915).[7]

▉ ¶ 24 In the instant case, the district court found that water intercepted in the mine, "ultimately, in the absence of the Kentucky–Utah Mine Tunnel would have contributed to Big Cottonwood Creek above the mouth of Big Cottonwood Canyon," before, during, and after the 1914 Morse Decree. This finding is supported by substantial evidence. Salt Lake presented testimony of four experts who testified that water intercepted in the mine would ordinarily and naturally flow into the creek absent interception at the mine.[8] These experts based this con-

---

5. During the time period relevant to this dispute, this Court defined percolating water as "diffused groundwater (groundwater not flowing in known or defined channels) and seeps and artesian springs that did not flow off the property owner's land." *Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 932 (Utah 1993) (citing *Riordan v. Westwood*, 115 Utah 215, 220–21, 203 P.2d 922, 925 (1949); Robert W. Swenson, *A Primer of Utah Water Law: Part II*, 6 J. Energy L. & Pol'y 1, 21–22 n.87 (1985)).

Neither party claims the mine intercepts underground water that flows in defined underground streams or channels, rather than by percolation. For purposes of consistency, we will refer to the underground water at issue as percolating water, as we have in prior cases. *See Provo River*, 857 P.2d at 932.

6. We have consistently held that an appropriator of water rights also owns a vested interest in the sources of that water, and no one may interfere with the source of the appropriator's water supply in a way that diminishes the quantity or quality of the appropriated water. *See Little Cottonwood Water Co. v. Sandy City*, 123 Utah 242, 249–50, 258 P.2d 440, 443 (1953). This principle holds true regardless of how far the source may be from the place of use, and regardless of whether the source waters flow on the surface or underground. *See id.; Peterson v. Wood*, 71 Utah 77, 262 P. 828 (1927); *Rasmussen v. Moroni Irr. Co.*, 56 Utah 140, 153, 189 P. 572, 578 (1920); *see, e.g., College Irr. Co. v. Logan River & Blacksmith Fork Irr. Co.*, 780 P.2d 1241, 1244 (Utah 1989); *Richlands Irr. Co. v. Westview Irr. Co.*, 96 Utah 403, 418, 80 P.2d 458, 465 (1938). In *Stubbs v. Ercanbrack*, 13 Utah 2d 45, 49–50, 368 P.2d 461, 463 (1962), we reasoned that "if the owners of water rights can be deprived of them by someone digging into and usurping this water at its source, then water rights become tenuous indeed, if not quite meaningless."

7. In *Mountain Lake Mining Co.*, all members of the Court agreed that underground waters intercepted in a mine that were naturally tributary to a nearby creek belonged entirely to the appropriators of that creek, *see id.* at 360, 149 P. at 934; *id.* at 368, 149 P. at 936–37 (Frick, J., concurring); *id.* at 369, 149 P. at 937–38 (Straup, C.J., dissenting), although the justices disagreed with respect to issues of proof. *See id.* at 360–61, 149 P. at 934–35; *id.* at 367, 149 P. at 936–37 (Frick, J., concurring); *id.* at 369, 149 P. at 937–38 (Straup, C.J., dissenting). Not unlike the present case, *Mountain Lake* was a quiet title action between a mining company that had intercepted approximately 8 c.f.s. of underground water while excavating its tunnel, and an irrigation company that had fully appropriated use of water flowing in a nearby creek. The mining company sought to quiet title in itself to most of the water intercepted in its tunnel, claiming this water was "developed water." *See id.* at 347, 149 P. at 929. The irrigation company claimed that the water intercepted in the tunnel was naturally tributary to its creek and that it therefore owned all of the water by virtue of its appropriation of the creek before excavation of the mine. *See id.* at 348, 149 P. at 929. This Court quieted title to all water intercepted in the mine in the irrigation company, based on the presumption that water intercepted in a tunnel excavated in a watershed that is drained by a nearby stream is tributary to that stream absent proof that this water is developed water. *See id.* at 367, 149 P. at 934; *id.* at 368, 149 P. at 936–37 (Frick, J., concurring).

8. Dr. William Parry, a professor of geology and geophysics at the University of Utah for 30 years and an expert on Wasatch Front geology, conducted a detailed study of Big Cottonwood Canyon topography and geology. He testified that underground water in the canyon is "shallow and active," and that "water that now flows from the [mine] would have, in the absence of the

clusion on geological characteristics of the canyon generally, and on the area surrounding the mine specifically; on chemical testing of water intercepted in the mine compared with water drawn from other areas in the canyon, including the creek; and on tests that determined the age of water flowing above and below ground throughout the canyon, particularly water intercepted in the mine and flowing in the creek. In light of all the credible evidence, the trial court did not err in finding that the mine water is tributary to Big Cottonwood Creek.

*B. Interception of Water from the Mine Substantially Interferes with Salt Lake's Title to Use of Water in the Creek*

¶ 25 Quieting title to source waters requires not only a finding that these waters are naturally tributary to an appropriated creek, but also that interception of these waters substantially interferes with the quantity or quality of water that would otherwise reach the appropriator of the creek.[9] *See Little Cottonwood Water Co. v. Sandy City*, 123 Utah 242, 250, 258 P.2d 440, 444 (1953); *Wrathall v. Johnson*, 86 Utah 50, 74, 40 P.2d 755, 766 (1935).

¶ 26 The district court found that interception of nearly .5 c.f.s. of water from the mine "impacts and interferes with the water rights of Salt Lake City at the mouth of Big Cottonwood Canyon," and that such interference is "substantial." This finding is supported by substantial evidence. The trial court noted that .5 c.f.s. of water continuously flowing from the mine would yield approximately 362 acre-feet of water each year,

---

tunnel, discharged into Big Cottonwood Creek and flowed down Big Cottonwood Creek." According to Dr. Parry, in the upper reaches of the canyon above the mine, water flows downward through relatively permeable Mississippian limestone rock formations, and is eventually forced to surface in the creek at or above Argenta, an area above the mouth of the canyon. From this point, the creek flows over impermeable consolidated bedrock which forms a groundwater flow barrier forcing water to remain in the creek until it reaches the mouth of the canyon. Dr. Parry testified that it is improbable that water continues to flow underground beyond Argenta because of the impermeable nature of quartzite and shale formations underlying the canyon in that area. Nor is there a tendency for water intercepted in the mine to flow outside the Big Cottonwood Drainage Area into other drainages. Dr. Parry also testified that chemical tests of surface and underground water in the canyon support his conclusions regarding groundwater flow based on geological and hydrological characteristics of the canyon.

Dr. Craig Forster, an associate professor at the University of Utah who had specialized in hydrogeology for 25 years and who assisted Dr. Parry's research of the canyon, testified that about 20% of rain and snowfall landing on a surface area approximately one square mile directly above the mine replenishes water intercepted in the mine. Dr. Forster concluded that, absent the mine, water now intercepted in the mine would "flow into the Creek and is tributary" to the creek. He testified that water from the recharge area above the Kentucky–Utah Mine flows underground in the direction of the creek, enters the sediment underlying the creek, then emerges in the flow of the creek one to two miles downstream. Dr. Forster based his conclusions on analysis of the geologic fault zones intersecting the canyon, the permeability and hydrologic conductivity of

rocks, and the fact that the mine intersects a boundary between igneous rocks and more permeable sedimentary rocks, where water would likely accumulate, as well as other factors. A report written by Drs. Parry and Forster concludes by stating:

> In the absence of the Kentucky–Utah tunnel, the water that infiltrates the ground in the high ridges above would have discharged at the surface into Big Cottonwood Canyon Creek. Construction of the tunnel has clearly intercepted ground water that would normally have appeared as springs and seeps along Big Cottonwood Creek and become a part of the base flow of the creek.

Testimony by two additional experts, Drs. Solomon and James, further supported the conclusions of Drs. Parry and Forster. Reports and testimony presented by Salt Lake's experts provide substantial evidence to support the district court's finding that percolating water intercepted in the mine is naturally tributary to the creek.

9. Allowing appropriation of source waters, where doing so does not interfere with a prior appropriator's quality or quantity of water, corresponds with the public policy of this arid region. It recognizes the need for insuring the highest possible development and most continuous beneficial use of all available water with as little waste as possible. *See, e.g., Wayman v. Murray City Corp.*, 23 Utah 2d 97, 104, 458 P.2d 861, 865 (1969) (Crockett, C.J., with 4 judges concurring in the result) (relying on public policy to argue applicability of "rule of reasonableness"). Requiring a finding of substantial interference of a prior appropriator's water rights, evidenced by material diminution in quantity or quality of water previously appropriated, serves to protect water rights and promote beneficial use of a valuable natural resource.

enough to support 362 families of four for an entire year. Assuming that virtually all water intercepted in the mine would naturally flow into the creek but for the presence of the mine, the court determined that interception of these waters created a substantial interference with Salt Lake's right to flow of water in the creek. We agree that diminution of the creek by nearly .5 c.f.s. is substantial.

¶ 27 SFPC argues that the district court erred in finding substantial interference without requiring Salt Lake to proffer actual measurements of water flowing in the creek at the mouth of the canyon, illustrating that diversion of water at the mine significantly diminished the flow in the creek. We disagree that a court must premise its finding of substantial interference on actual measurements reporting flow before and after interception of the water at its source. Measurements of water flow are often not available to prove interference, and when they are, their value is limited to the extent that other environmental factors dictate flow, such as season and amount of precipitation. It is especially difficult to demonstrate by empirical evidence the extent to which interception of percolating water interferes with a surface body of water to which it is tributary. Hydrogeological characteristics in a particular area may extend to decades the time it takes for underground water to percolate through the soil before reaching the surface, only then making the effect of interception evident based on diminished water levels.

¶ 28 Given the difficulty in obtaining reliable measurements of water flow that accurately reflect the effects of interception of underground source waters, we cannot agree that a finding of interference must be premised on this type of evidence. If nearly .5 c.f.s. of water intercepted in the mine would naturally flow into the creek but for the existence of the mine, it is reasonable to infer

that Salt Lake has suffered, or will eventually suffer, a diminution in its water right of approximately 362 acre-feet of water each year. This evidence is sufficient to support the trial court's finding of substantial interference.[10]

### C. Percolating Waters Jurisprudence Does Not Preclude Salt Lake's Title to Mine Water

¶ 29 SFPC next argues that it is irrelevant whether underground water intercepted in the mine is naturally tributary to Big Cottonwood Creek, because, in 1914, when rights to the creek were adjudicated in the Morse Decree, underground water in Utah was not public and could not be appropriated. The Morse Decree could not, therefore, provide any rights to percolating waters intercepted in the mine. In support of its argument, SFPC relies on textual changes to Utah's Water Code in 1935. In 1914, Utah Code Ann. § 100–1–1 read: "The water of all streams and other sources in this state, whether flowing above or under the ground, *in known or defined channels*, is hereby declared to be the property of the public, subject to all existing rights to the use thereof." Comp. Laws of Utah § 40–3–1288x18 (1907) (emphasis added). The Legislature amended this provision in 1935 to read as follows: "All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof." 1935 Utah Laws ch. 105, § 100–1–1 (presently codified at Utah Code Ann. § 73–1–1). According to SFPC, the 1935 omission of the phrase "in known or defined channels" indicates that percolating water, which by definition does not flow in a known or defined channel, was not public property in 1914 and, therefore, not subject to appropriation.

¶ 30 SFPC also relies on *Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927,

---

10. Generally, the inquiry regarding interference focuses on actual interference in the quantity or quality of the water to which the prior appropriator is entitled. It is possible that SFPC currently uses less than the nearly .5 c.f.s. of water it claims, and that it returns the unused water to the creek in compliance with the terms of its contract with Salt Lake. Based on the diligence

claim filed with the state engineer, SFPC is claiming actual, beneficial use of nearly .5 c.f.s. of water. We do not express an opinion on whether a claim to a lesser amount, or evidence that less water is beneficially used in fact, would preclude a finding of interference with Salt Lake's rights to water at the mouth of the canyon.

932–33 (Utah 1993), to support its argument that percolating waters were not subject to appropriation prior to 1935. In *Provo River*, this Court interpreted the scope of the Weber River Decree, a general adjudication lasting between 1921 and 1937, to ascertain whether the decree was intended to adjudicate all waters, including percolating waters, in the Weber River drainage area. This would have foreclosed subsequent appropriation of any water with a hydrological connection to the river. We concluded the Weber River Decree adjudicated only water rights to the Weber River and its *surface* tributaries, rather than rights to all isolated springs and percolating water. *See id.* at 932. We based our determination in part on the fact that during the first fourteen years of the Weber River proceedings, from 1921 through 1935, Utah law did not require users of percolating waters to assert their rights in a general adjudication. However, we did not hold that any adjudication of water rights commencing prior to 1935 could not, as a matter of law, resolve rights to percolating waters.

■■■ ¶ 31 As part of our *Provo River* analysis, we provided an historical overview of this Court's early treatment of percolating waters.[11] Although we initially treated percolating waters as subject to the absolute control of the property owner, our view changed in conjunction with a greater understanding of the way underground water systems work in this mountainous and arid state. As we have since indicated, the public has always owned percolating waters in spite

of statements to the contrary in earlier cases. In *Provo River*, we rejected the characterization of percolating water as "privately owned." *See id.* at 933 n. 8. We acknowledged that some pre–1935 decisions "characterized diffused groundwater and isolated springs and seeps as subject to private ownership," *id.* However, we expressly agreed with the statement by Chief Justice Wolfe, made in 1952, that public ownership of all water in the state, even that which percolates underground,

> "*must have always been so.* ... But the fact that the State progressively applied regulation to the acquisition of use rights in water does not disturb the fundamental principle that all water ... at least from the time it reaches land within the confines of this state belongs to the public—the people of this state."

*Id.* (quoting *McNaughton v. Eaton,* 121 Utah 394, 405, 242 P.2d 570, 575 (1952) (Wolfe, C.J., concurring)).[12]

¶ 32 SFPC's reliance on the 1935 textual changes to the Water Code is likewise misplaced. For even prior to 1935, percolating water was subject to appropriation by private individuals who diverted and beneficially used such water. *See Dalton v. Wadley,* 11 Utah 2d 84, 355 P.2d 69 (1960); *Fairfield Irr. Co. v. Carson,* 122 Utah 225, 247 P.2d 1004 (1952); *Hanson v. Salt Lake City,* 115 Utah 404, 205 P.2d 255 (1949). The 1935 Utah law simply subjected appropriators of underground waters to the statutory application process of our Water Code.[13] *See Riordan,* 115 Utah at 224–25, 203 P.2d at 927.

---

**11.** "Our cases prior to 1921 uniformly viewed percolating waters as subject to the property owner's absolute control." *Provo River,* 857 P.2d at 932 (citing *Riordan,* 115 Utah at 219, 203 P.2d at 924). However, after 1921 "the absolute control exercised over [percolating water] by landowner-users was gradually whittled away by a series of opinions from this court." *Id.* Finally, in 1935, we "virtually abandoned the distinction between percolating waters and other waters by holding that the use of isolated springs [a type of percolating water] is governed by the appropriation statute." *Id.* at 932–33 (citing *Riordan,* 115 Utah at 224, 203 P.2d at 927; *Justesen v. Olsen,* 86 Utah 158, 40 P.2d 802 (1935); *Wrathall v. Johnson,* 86 Utah 50, 40 P.2d 755 (1935)). In that same year, the Legislature "ratified our view," *Provo River,* 857 P.2d at 933 (citing 1935 Utah Laws ch. 105, § 100–1–1), as we suggested

it should in *Justesen* and *Wrathall,* by amending Utah's Water Code to "recognize that all waters of the state, whether above or below the surface, are subject to the statutory appropriation and adjudication processes." *Id.* (citing 1935 Utah Laws ch. 105, § 100–1–1 (now codified at Utah Code Ann. § 73–1–1)).

**12.** Similarly, in *Riordan* two members of this Court stated that public ownership of all underground and surface waters "has probably always been the law of this state," regardless of the 1935 amendment to Utah's Water Code. *See Riordan,* 115 Utah at 224, 203 P.2d at 927.

**13.** According to Justice Wolfe, when the Legislature amended the Water Code in 1935, declaring all waters "to be property of the public," it

¶ 33 SFPC's argument that the Morse Decree could not grant Salt Lake title to percolating water intercepted in the mine because this water was not public property until 1935 mischaracterizes early Utah law and ignores this Court's clear statements that percolating waters have always been merely recognized a fact that had always been so. *See McNaughton,* 121 Utah at 405, 242 P.2d at 575. Justice Wolfe earlier made the following observation in his concurring and dissenting opinion in *Riordan:*

> The legislature did not by a declaration [in 1935], make public what were previously non-public waters. It simply extended to all public waters the necessity of application to the state engineer in order to appropriate, and made such appropriation subject to all existing rights.... [Underground waters] were always public until appropriated by diligence or by application, when the latter was made the necessary method of appropriation.

*Riordan,* 115 Utah at 235, 203 P.2d at 932 (Wolfe, J., concurring and dissenting).

14. Even if we were to agree that prior to 1935 percolating water was not public property but belonged to the owner of the soil through which it passed, Salt Lake and its predecessors still obtained title to water intercepted in the Kentucky–Utah Mine under a "well established" exception to this rule.

> We have ... repeatedly held that the appropriators of the waters of natural streams acquired a vested interest in the source of the waters of such streams which was percolating through the soil of the lands which belonged to the public domain at the time when the appropriation was first made.

*Riordan,* 115 Utah at 220, 203 P.2d at 925 (citing *Peterson v. Wood,* 71 Utah 77, 262 P. 828 (1928); *Peterson v. Lund,* 57 Utah 162, 193 P. 1087 (1920); *Rasmussen v. Moroni Irr. Co.,* 56 Utah 140, 189 P. 572 (1920); *Cole v. Richards Irr. Co.,* 27 Utah 205, 75 P. 376 (1904)).

Under this exception, Salt Lake and its predecessors appropriated title to water intercepted in the mine by virtue of the Morse Decree because they fully appropriated water flowing in the creek several years before land through which the Kentucky–Utah Mine extends was segregated from the public domain. Silver Fork argues that the Kentucky–Utah Mine was started in 1898. We cannot locate evidence that indicates when the mine was actually patented. In any event, 1898 is the first year in which property through which the mine was excavated can be considered "private." On the other hand, Salt Lake and its predecessors fully appropriated Big Cottonwood Creek between 1848 and 1894. Under the exception, in 1894 underground water later intercepted in the mine was public and subject to appropriation, and was appropriated, by Salt Lake and its predecessors. *See Peterson,* 71 Utah

public property subject to appropriation.[14] Therefore, *Progress* could, and in this case did, provide Salt Lake with title to water intercepted in the Kentucky–Utah Mine. When Salt Lake and its predecessors appropriated use of waters in the creek, they also appropriated percolating source waters of the creek.[15]

at 86, 262 P. at 832; *Peterson,* 57 Utah at 169–70, 193 P. at 1087–90; *Rasmussen,* 56 Utah at 153, 189 P. at 576; *Stookey v. Green,* 53 Utah 311, 317–18, 178 P. 586, 588 (1919); *Cole,* 27 Utah 205, 75 P. 376; *Crescent Mining Co. v. Silver King Mining Co.,* 17 Utah 444, 54 P. 244 (1898); *Sullivan v. Northern Spy Mining Co.,* 11 Utah 438, 443–44, 40 P. 709, 710 (1895); *see also Snake Creek Mining & Tunnel Co. v. Midway Irr. Co.,* 260 U.S. 596, 43 S.Ct. 215, 67 L.Ed. 423 (1923).

15. SFPC also claims that Salt Lake is judicially estopped from claiming that the Morse Decree adjudicated percolating waters. According to SFPC, during the *Progress* adjudication in which this Court affirmed the Morse Decree, Salt Lake successfully argued in its brief to this Court that the district court in *Progress* had no jurisdiction to adjudicate underground percolating waters. Salt Lake argued that "percolating waters belong to the owners of the land in which they are found. They are not subject to appropriation." *See* Brief for Respondent (Salt Lake City) at 60–62, *Progress Co. v. Salt Lake City,* 53 Utah 556, 173 P. 705 (1918) (No. 2851). SFPC contends that Salt Lake may not now argue that *Progress* adjudicated all percolating waters tributary to Big Cottonwood Creek.

SFPC's contention is untenable for two reasons. First, SFPC was not a party to *Progress* that detrimentally changed its position by reason of Salt Lake's inaccurate representation of Utah's water law in *Progress.* Under judicial estoppel, "[a] person may not, to the prejudice of another person deny any position taken in a prior judicial proceeding between the same persons or their privies involving the same subject-matter, if such prior position was successfully maintained." *Salt Lake City v. Silver Fork Pipeline,* 913 P.2d 731, 734 (Utah 1996) (*Silver Fork I* ) (citing *Tracy Loan & Trust Co. v. Openshaw Inv. Co.,* 102 Utah 509, 515, 132 P.2d 388, 390 (1942)).

Second, it is clear that Salt Lake's earlier statements represented its view of the legal status of percolating water in Utah at the time of that case. Generally, a person who has taken an erroneous position on a question of law is not estopped from later taking the correct position provided the opposing party has suffered no prejudice because of the change in position. *See Pittston v. O'Hara,* 191 Va. 886, 63 S.E.2d 34, 43 (1951); 28 Am.Jur.2d *Estoppel and Waiver* § 70, at 700 (1966). As we stated in *Silver Fork I,* the purpose of judicial estoppel is "to uphold the

D. *Water Intercepted in the Mine Is Not Subject to a Senior Appropriation by SFPC*

¶ 34 SFPC further attacks Salt Lake's title to use of water intercepted in the mine by claiming SFPC appropriated the water before Salt Lake did. Utah is a prior appropriation state, where the appropriator first in time is first in right. *See* Utah Code Ann. § 73-3-1 (1989). A senior appropriator is guaranteed the full measure of his or her appropriation before any claim by a junior appropriator may be satisfied. *See id.; see also Hanson v. Salt Lake City*, 115 Utah 404, 205 P.2d 255 (1949). Therefore, even if Salt Lake is otherwise entitled to source water intercepted in the mine, if SFPC or its predecessors in interest lawfully appropriated water from the mine before Salt Lake or its predecessors did, Salt Lake cannot prohibit SFPC's use of the water.

¶ 35 However, we find that SFPC has no valid claim to waters intercepted in the mine predating 1894, the date by which Salt Lake and its predecessors in interest appropriated use of almost all the water flowing in the creek near the mouth of the canyon. First, even if Salt Lake and its predecessors did not fully appropriate the water in the creek until 1914, the year the Morse Decree issued, SFPC would have no interest that predates Salt Lake's. Excavation of the mine did not commence until 1915, the earliest time from which predecessors of SFPC could have beneficially used the .5 c.f.s. of water intercepted in the mine. In fact, evidence indicates that the mine did not produce a significant amount of water until after 1930.

Second, as discussed more fully below regarding SFPC's diligence claim, even if we assume that it was possible to obtain rights to the .5 c.f.s. of water intercepted at the mine before the mine was built, SFPC has failed to establish that it has a legitimate claim to that water. For one, SFPC failed to establish a chain of title between itself and early Silver Fork residents. *See infra,* ¶¶ 42–45. Furthermore, SFPC failed to demonstrate that early Silver Fork residents beneficially used (i.e., appropriated) .5 c.f.s. of water flowing in the area. *See infra,* note 19. Therefore, SFPC has no interest in the mine waters senior to Salt Lake's title.[16]

E. *Salt Lake's Failure to File a Change Application Does Not Preclude Its Title to Mine Waters*

¶ 36 SFPC notes that although Salt Lake sold water intercepted in the mine to SFPC or its predecessor from 1945 until the present, Salt Lake did not file an application with the state engineer seeking approval for change in its point of diversion, from the mouth of the canyon to the mine, until December 10, 1991. SFPC argues that because Salt Lake failed to obtain permission to divert water at the mine until 1991, it had no right to these waters, and by selling this water Salt Lake has illegally enlarged its rights in the creek. On this point, the trial court held that "[a]ny failure of Salt Lake City to obtain an approved change application is irrelevant to the instant action and any such failure did not result in a forfeiture of any of Salt Lake City's water rights." We agree.

---

sanctity of oaths, thereby safeguarding the integrity of the judicial process from conduct such as knowing misrepresentations or fraud on the court." *Silver Fork I*, 913 P.2d at 734. The purpose behind judicial estoppel is not served in a case such as this, where "there is no evidence that the party against whom judicial estoppel is sought knowingly misrepresented any facts in the prior proceeding." *Id.*

In addition, there has been some confusion regarding this Court's treatment of percolating waters during the early part of this century. *See Provo River Water Users' Ass'n v. Morgan*, 857 P.2d 927, 932–33 (Utah 1993); *Snake Creek Mining & Tunnel Co. v. Midway Irr. Co.*, 260 U.S. 596, 598, 43 S.Ct. 215, 67 L.Ed. 423 (1923). Salt Lake made statements contrary to its cur-

rent position before this Court decided *Progress* in 1918. Since that time, this Court has clarified the legal status of percolating waters in Utah. *See Provo River*, 857 P.2d at 932–33.

16. SFPC also claims that some of its shareholders have succeeded to rights adjudicated in the Morse Decree. SFPC claims these rights are superior to those Salt Lake owns by virtue of the Morse Decree, because the Morse Decree provides that these waters be diverted upstream from Salt Lake's point of diversion. However, individual shareholders of SFPC are not before the Court to litigate their interests under the Morse Decree. We decline to comment on the rights of these individuals relative to the rights of Salt Lake under the Morse Decree.

¶ 37 Salt Lake's failure to file a change application does not affect its title to use water intercepted in the mine, in spite of the Water Code's prohibition against changing a point of diversion without an approved application to do so. Utah Code Ann. § 73-3-3 allows parties to change the place of diversion, but requires that such changes "be made in the manner provided in this section." *Id.* § 73-3-3(2) & (3). The statute expressly prohibits a change in point of diversion before a change application is approved by the state engineer. *See id.* § 73-3-3(4). Although, as we stated in *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 104 Utah 216, 217, 140 P.2d 638, 639 (1943), section 73-3-3 "provides its own enforcement clause and nowhere in the statutes does it appear that . . . a change in the place of the diversion . . . shall constitute a forfeiture of the water" to which a party is otherwise entitled. The enforcement provision of section 73-3-3 reads:

(9) Any person who changes or who attempts to change a point of diversion, place, or purpose of use, either permanently or temporarily, without first applying to the state engineer in the manner provided in this section:

(a) obtains no right; and

(b) is guilty of a misdemeanor, each day of the unlawful change constituting a separate offense, separately punishable.

Utah Code Ann. § 73-3-3(9) (1989). Salt Lake's failure to file a change application could not alone deprive it of its rights to waters intercepted in the mine.

¶ 38 Aside from Utah's Water Code, nothing precludes Salt Lake from changing its point of diversion except the general rule that it may not do so to the injury of any downstream appropriator who is a party to the dispute. *See, e.g., East Bench Irr. Co. v. Deseret Irr. Co.*, 2 Utah 2d 170, 177, 271 P.2d 449, 454 (1954). As discussed more fully below, SFPC, the only other party in this dispute, owns no interest in the waters intercepted in the mine apart from its purchase agreement with Salt Lake. Therefore, no party to this dispute can claim injury as a result of Salt Lake's diversion of water at the mine. Salt Lake's failure to file a change application with the state engineer has no bearing on its claim to the water intercepted in the mine.

## VII. SILVER FORK'S TITLE TO WATER INTERCEPTED IN THE KENTUCKY-UTAH MINE

¶ 39 SFPC claims title to approximately .5 c.f.s. of percolating water intercepted inside the mine based on two theories. First, SFPC asserts, by way of a diligence claim, that it is successor-in-interest to early Silver Fork residents, and the owners and employees of the Kentucky-Utah and Woodlawn Mines, who diverted and beneficially used this water prior to 1935. Second, SFPC claims it acquired title to water intercepted in the mine by adverse possession.

¶ 40 The trial court found that SFPC's 1991 diligence claim "is unsupported by the evidence." The court also concluded SFPC "failed to establish any of the elements of adverse possession." Ultimately, the court held that SFPC has "no right to the use of waters emanating from the mine tunnel, separate and distinct from [its] interest under the contracts with Salt Lake."

### A. SFPC's Diligence Claim to Water Intercepted in the Mine

¶ 41 Currently, diligence claims[17] to percolating water appropriated prior to

---

17. Prior to 1935, Utah's statutory permit system for appropriation of water did not apply to percolating waters. *See Swenson, supra*, at 23-24. An amendment to Utah's Water Code in 1935 expanded the permit system to regulate the appropriation of percolating waters. *See Hanson v. Salt Lake City*, 115 Utah 404, 415, 205 P.2d 255, 260 (1949). After 1935, percolating water could not be appropriated without compliance with Utah's statutory appropriation process. *See id.* However, any person who had beneficially used percolating water before 1935 could simply file a notice of claim to this water (a "diligence claim") with the state engineer and entirely avoid the process of obtaining a permit. *See* 1935 Utah Laws ch. 105, § 100-5-2. By allowing pre-1935 appropriators of percolating water to bypass the permit procedure, "the legislature recognized that prior thereto the right to use such waters could be acquired by mere appropriation to a beneficial use without complying with the statutory requirements, and thus by implication validated all appropriations of underground

1935 are filed under Utah Code Ann. § 73–3–17. Filing a claim under this provision constitutes prima facie evidence of the validity of that claim. *See* Robert W. Swenson, *A Primer of Utah Water Law: Part II*, 6 J. Energy L. & Pol'y 1, 23 (1985). However, diligence rights are expressly limited "to the amount of water actually beneficially used prior to the effective date of the 1935 act." *Id.* at 24 (citing *In re General Determination of Water Rights in the Escalante Valley Drainage Area*, 6 Utah 2d 1, 4, 304 P.2d 964, 965–66 (1956)).

¶ 42 SFPC cannot claim it succeeded to the diligence rights of early Silver Fork residents because it failed to prove that the land owned by early residents who allegedly obtained diligence rights to mine waters is now owned by shareholders of SFPC, rather than other parties unrelated to SFPC. Generally, water rights are appurtenant to land on which the water is beneficially used. *See* Utah Code Ann. §§ 73–1–10 to –11 (1989). They are "transferred by deed in substantially the same manner as real estate," and pass automatically to a grantee of the land unless expressly reserved. *See id.* Silver Fork's title to waters intercepted in the mine necessarily depends on whether early Silver Fork residents acquired diligence rights to these waters before 1935 and then transferred their rights to current SFPC shareholders, or to intervening parties who thereafter transferred these rights to current shareholders. However, SFPC has presented no evidence demonstrating the succession of title between early Silver Fork residents, who may in fact have obtained diligence rights to water from the mine, and current SFPC shareholders. The only connection SFPC has shown between its shareholders and early Silver Fork residents is that they have all lived in the same general vicinity of the canyon. That connection does not suffice to establish a succession of title to property or water rights.

¶ 43 SFPC also fails to explain how it could be successor-in-interest to any company owning and operating either the Kentucky–Utah or the Woodlawn Mine. Neither SFPC nor its predecessor-in-interest, Jesse Hulse, has

owned an interest in the companies operating the Kentucky–Utah and Woodlawn Mines, nor have they ever owned land through which these mines were excavated. In support of its claim, SFPC submitted an affidavit of Dilworth Nebeker, Jr., a former owner of the mine, who stated that owners of the mine granted permission to use mine water "on demand and to the full extent required for mining and domestic purposes by the people in the area prior to 1935." Thereafter, verbal and written permission was granted to Jesse Hulse and SFPC to use water from the mine. SFPC also proffered a 1950 document in which owners of the mine granted SFPC permission to bury pipe and construct a small cement reservoir on mine property in order to store water from the mine for use by Silver Fork residents. However, this document did not purport to transfer to SFPC any interest in the water itself. We fail to see how permission to use water intercepted in the mine could transfer any interest in that water, even assuming the mining company owned any interest in this water to transfer.

¶ 44 At most, SFPC is successor-in-interest to Jesse Hulse. Hulse organized SFPC in 1950 as a non-profit corporation for the purpose of maintaining Silver Fork's water supply from the Kentucky–Utah Mine. However, any rights to water intercepted in the mine that Hulse may have obtained accrued after 1935 and cannot serve as the basis of a diligence claim. *See Hanson*, 115 Utah at 415, 205 P.2d at 260. There is no reliable evidence that Hulse or others who built cabins on the Hulse–Nielson development beneficially used water from the mine prior to 1940. In 1940, Hulse obtained authorization to excavate a ditch across U.S. Forest Service land. Only after completing the ditch in the early 1940s did Hulse begin using water from the mine. Before 1940, Hulse and other cabin owners dipped water from the nearby stream.

¶ 45 Given the lack of evidence regarding chain of title, the trial court correctly reject-

waters made ... prior to 1935." *Hanson,* 115 Utah at 416, 205 P.2d at 260.

ed SFPC's diligence claim.[18]

### B. SFPC's Claim to Mine Waters by Adverse Use

¶ 46 Finally, SFPC claims title to the mine water through adverse possession.[19] The elements of proof necessary to acquire a prescriptive right to water are seven years of continuous, uninterrupted, hostile, notorious, and adverse enjoyment under a claim of title with knowledge and acquiescence of the owner of the prior right and at a time when the owner of the right needed the water adversely claimed.

*College Irr. v. Logan River & Blacksmith Fork Irr. Co.*, 780 P.2d 1241, 1243 (Utah

18. Even if SFPC could provide proof of succession of title between early SFPC residents who acquired diligence rights to water and current Silver Fork shareholders, it presented no reliable evidence to support its claim that 1,500 people residing or employed in the Silver Fork area prior to 1935 beneficially used nearly .5 c.f.s. of water from the mine. SFPC's diligence claim necessarily rests on the factual assertion that residents and miners in the Silver Fork area beneficially used .446 c.f.s. of water from the mine prior to 1935. We agree with the trial court's observation that SFPC's evidence on this point is "inconclusive at best" and "extremely limited."

Ivy Jean Taylor, a key witness for SFPC testified from personal knowledge that, in 1927, there were cabins in the Silver Fork area; however, Mrs. Taylor could not say how many cabins there were at the time because she did not count them. Mrs. Taylor recalled that a ditch carried water through the Silver Fork area and that she knew of no source for water in the ditch other than the mine. Salt Lake, however, presented evidence that this was the ditch constructed by Jesse Hulse in the early 1940s. Salt Lake also presented topographical and aerial maps showing that Silver Fork was an insubstantial community with about two or three structures just prior to 1935. This evidence was corroborated by Ralph Hulse, who testified that he could remember only a few cabins in Silver Fork in 1935.

SFPC also relies on an historical publication that indicates Silver Fork had "two stores, one saloon, three blacksmith shops, one livery stable, three sawmills and a hotel" by the late 1870s. However, the author of this publication, Dr. Laurence James, testified that even though a large number of people may have lived in the Silver Fork area during the latter part of the 1800s, that number significantly diminished well before the turn of the century, and that between 1915 and 1945 probably only 200 people lived in the entire canyon. Dr. James explained that the community in Silver Fork diminished after mining became unprofitable in the late 1800s, and that fire may have destroyed the commercial establishments reported to be in the Silver Fork area.

There moreover, SFPC provided no support its claim that SFPC residents beneficially used nearly .5 c.f.s. of water from the mine before 1935, rather than from other nearby sources such as Silver Fork Creek or Big Cottonwood Creek. SFPC provided evidence that approximately .5 c.f.s. of water flowed through the ditch transporting water outside the mine, according to measurements taken in 1921. However, this does not establish how much, if any, of this water was beneficially used by people living in Silver Fork. As mentioned above, SFPC presented an affidavit by Dilworth Nebeker, Jr., a former owner of the mine, who stated that mine water "was used on demand and to the full extent required for mining and domestic purposes by the people in the area prior to 1935." However, there is no indication how many people used this water, for what purposes, or in what amount. These facts are crucial to proving whether approximately .5 c.f.s. of water was beneficially used.

Finally, SFPC failed to prove that miners employed in the Woodlawn or the Kentucky–Utah Mine beneficially used water intercepted by those mines for domestic or culinary purposes, or if they did, that this use was substantial. With respect to miners' use of water intercepted in the mine, Dr. James testified that excavation of the mine occurred only intermittently between 1915 and 1945, and that occasionally work at the mine discontinued for years at a time. He also estimated that the mine employed no more than fifteen miners to excavate the tunnel and operate necessary equipment, and most likely employed only four or five. According to Dr. James, water intercepted in mine workings is usually diverted to the portal through a ditch which also transports rock sediment and human and animal waste outside the tunnel, making this water unfit for human consumption. Nor is water intercepted in mines typically used to maintain excavation equipment, because this water is contaminated by dirt and rock sediment generated by the drilling and blasting necessary in mining operations.

19. Before 1939, Utah law allowed a party to obtain title to use of water by adverse possession. *See Hammond v. Johnson*, 94 Utah 20, 28, 66 P.2d 894, 900–01 (1937). Following an amendment to Utah's Water Code in 1939, adverse use that began before 1939 could still ripen into title after the effective date of the Act. *See Mitchell v. Spanish Fork West Field Irr. Co.*, 1 Utah 2d 313, 317, 265 P.2d 1016, 1019 (1954); *Wellsville East Field Irr. Co. v. Lindsay Land & Livestock Co.*, 104 Utah 448, 460–66, 137 P.2d 634, 640 (1943). However, adverse use commenced after the effective date of the act could not ripen into title by adverse possession: "[N]o right to the use of water either appropriated or unappropriated can be acquired by adverse use or adverse possession." 1939 Utah Laws ch. 111, § 1.

1989). The presumption is against the acquisition of a right by adverse use, and the burden of proof is upon the party asserting the right. *See id.* Under the doctrine of "tacking," adverse possession may be completed by a series of possessors in privity. *See, e.g., Royal Street Land Co. v. Reed,* 739 P.2d 1104, 1106 (Utah 1987); *Home Owners' Loan Corp. v. Dudley,* 105 Utah 208, 225, 141 P.2d 160, 168 (1943).

¶ 47 The trial court properly rejected SFPC's adverse possession claim. Specifically, SFPC failed to prove seven years of continuous, uninterrupted, hostile, notorious, and adverse enjoyment under claim of title, beginning prior to 1939, by any party it may legitimately claim as its predecessor-in-interest. As stated above, Jesse Hulse is the only party SFPC may reasonably claim as its predecessor-in-interest. There is no reliable evidence that Hulse's predecessors made continuous, uninterrupted, hostile, notorious, and adverse use of mine water prior to 1939. In fact, as discussed at length above, SFPC's allegations that a substantial number of Silver Fork residents prior to Hulse beneficially used .446 c.f.s. of water from the mine is extremely speculative. This falls far short of the proof required to support an adverse possession claim in light of the presumption against these claims. Because Silver Fork cannot establish that its predecessors adversely used water from the Kentucky–Utah Mine prior to 1939, the trial court correctly rejected SFPC's adverse possession claim.

¶ 48 Because we affirm the trial court's determination to quiet title to waters intercepted in the Kentucky–Utah Mine in Salt Lake, and its rejection of SFPC's diligence and adverse possession claims, we do not consider SFPC's counterclaim seeking reimbursements of amounts it has paid to Salt Lake to purchase water from the mine.

¶ 49 Affirmed.

¶ 50 Chief Justice HOWE, Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Justice STEWART's opinion.